IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF DELAWARE.

HENRY GLANDING
PETITIONER

V.

07-469

Thomas CARROLL (WARDEN)
DEFENDANT



FILED

JAN 02 2008

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

RD Scanned

APPENDIX TO ANSWER TO STATES ANSWER

TO HABEAS CORPUS.

ATTORNEYS LETTERS + SUPREME COURT DOCKETS.

SUPPRESSION HEARING MOTION AND TRANSCRIPT.

SOME TRIAL TRANSCRIPTS

12-28-07
DATED SIGNED

Henry W Glanding Jr
HENRY W GLANDING Jr
D.C.C.
1181 Paddock Rd.
SMYRNA DEC. 19977

(A)

TABLE OF CONTENTS

DESCRIPTIONS

LETTER FROM SUPREME COURT TO MR. Schmid (ESQ)
WITH INSTRUCTIONS FOR MR. Schmid TO ADVISE MR. GLANDING
THAT ALL FUTURE CORRESPONDENCE GO THREW HIS ATTORNEY — 1.

SUPREME COURT DOCKET. DOCKET shows TIMELY
APPEAL, (By ME) LETTER TO MR. Schmid DIRECTING him TO REC-
OGNIZE his CONTINUING OBLIGATIONS. UP TO WITHDRAWL AS
COUNSEL. OTHER docket INFORMATION! — 2 - 3.

LETTER FROM MR. MODICA, Showing DATE he WAS
OBTAINED AS COUNSEL by ME — .4

MARYLAND STATE'S NOTICE OF NOL·PROS. INFORMANT
(JAMES PATTERSON) NOT RELIABLE — 5 - .6.
MOTION FOR SUPPRESSION OF EVIDENCE (Filed by me on 11-10-02) 7 - 9.
ORDER TO MOTION - CHALLANGING Vehicle + house SEARCH ↑ — 10.
NOTICE OF MOTION Filed By GLANDING — 11.
CERTIFICATE OF SERVICE NOTICE TO - PROTHONOTARY - — 12.
CERTIFICATE OF SERVICE NOTICE TO ATTORNEY GENERAL — 13.
CERTIFICATE OF SERVICE NOTICE TO ATTORNEY MR. L. Schmid — 14
LETTER FROM MR. MODICA Plus RESULTS FROM ARGUEMENTS RAISED — 15
IN POST CONVICTION - BILL # 164 ~ BILL # 146 WAS ALSO — 16

SUPPRESSION HEARING MOTION COPIES EXIBIT PAGES 1 - .107. 17-43
Supp. HEAR. EXIBIT Pg (5) CHALLANGING STOP + SEARCH of Vehicle - VALID Page -18
SEARCH WARRANT - ISSUANCE - CIRCUMSTANCES OF TIMING of "
SEARCH OF RESIDENCE. "
Supp - HEAR - EXIBIT Pg (65) REASON FOR SEARCH WARRANT AND
STATES DAYTIME SEARCH WARRANT - WAS going TO EXIQUITE
AT 10:00 Pm. — 33
Supp - HEAR - EXIBIT Pg (95) ATTORNEY WITHDREW CHALLANGING
SEARCH WARRANT - INEFFECTIVE COUNSEL - HAVING NO CASE — 40
LAW
Supp - HEAR - EXIBIT Pg (10) STATE'S GLANDING does "NOT" — 42
have VIOLANT HISTORY.

TRIAL TRANSCRIPT COPIES 44 - 61

TRIAL-TRANS- EXIBIT Pg 127 POLICE TESTIFIED WAS IN
GLANDING'S house UNTIL 11:55 Pm Night TIME — 51

BOTH TRANSCRIPTS show EVIDENCE used - STATED
By GLANDING.

Ⓑ

SUPREME COURT OF DELAWARE

CATHY L. HOWARD
*Clerk*

AUDREY F. BACINO
*Assistant Clerk*

DEBORAH L. WEBB
*Chief Deputy Clerk*

LISA A. SEMANS
*Senior Court Clerk*

#21
SUPREME COURT BUILDING
55 THE GREEN
P.O. BOX 476
DOVER, DE 19903

(302) 739-4155

October 21, 2002

Lloyd A. Schmid, Jr., Esquire
Office of the Public Defender
530 South State Street
Dover, DE 19901

RE:    *Henry W. Glanding v. State*, No. 236, 2002

Dear Counselor:

Enclosed is a copy of an Affidavit Requesting to Proceed Pro Se Pursuant to Rule 26(d)(iii) received on October 16, 2002 from Mr. Henry Glanding, in the above-captioned matter. The Court has directed me to provide you with a copy of Mr. Glanding's Affidavit for appropriate disposition. Please contact Mr. Glanding about his concerns and inform him that all future correspondence to the Court on his behalf should be through you as his attorney.

By copy of this letter, I am informing John R. Williams, Esquire of the Department of Justice, of the Court's action regarding Mr. Glanding's document. I am providing Mr. Williams with a copy of Mr. Glanding's document for informational purposes only. Since the appellant's opening brief under Rule 26(c) has previously been filed, the Court will take no further action regarding Mr. Glanding's document.

Very truly yours,

Lisa A. Semans

/eas

Enclosure(s)

cc:    Mr. Henry Glanding, Jr.
          (with docket sheet)
       John R. Williams, Esquire
          (with copy of Mr. Glanding's affidavit)

IN THE SUPREME COURT OF THE STATE OF DELAWARE

236 , 2002

L. A. SCHMID

HENRY GLANDING, JR.,
    Defendant Below,
    Appellant,

v.

J. R. WILLIAMS

STATE OF DELAWARE,
    Plaintiff Below,
    Appellee.

DF $ 00.00

2002

| 1 | May 02 | Notice of appeal from the order dated 4/23/02, in the Superior Court, in and for Kent County, by President Judge Ridgely, in Cr.ID No. 0105009486A, with no designation of transcript. (no service shown) (eas) |
| 2 | May 02 | Letter dated 5/2/02 from Senior Court Clerk to Lloyd A. Schmid, Esquire, directing that he recognize his continuing obligation by 5/13/02. (eas) |
| 3 | May 13 | Letter dated 5/13/02 from Lloyd A. Schmid, Jr., Esquire to Chief Justice and Justices, recognizing his continuing obligation. (eas) |
| 4 | May 13 | Formal notice of appeal from the order dated 4/23/02, in the Superior Court, in and for Kent County, by President Judge Ridgely, in Cr.ID No. 0105009486A. (served by mail 5/13/02) (eas) |
| 5 | May 13 | Directions to court reporter of proceedings below to be transcribed pursuant to Rule 9(e) by appellant. (service shown on court reporter by mail 5/13/02) (eas) |
| 6 | May 14 | Letter dated 5/14/02 from Senior Court Clerk to Jennie Washington, transcript is due to be filed by 6/25/02. (eas) |
| 7 | Jul 01 | Letter dated 7/1/02 from Chief Deputy Clerk to Debbie Burrell, requesting the transcript or an extension request be filed no later than 7/12/02. (dlw) |
| 8 | Jul 10 | Court reporter's final transcript log entry: Prothonotary received 7-3-02. (clh) |
| 9 | Jul 10 | Letter dated 7-10-02 from Clerk to Prothonotary, the record is due to be filed by 7-15-02. (clh) |
| 10 | Jul 15 | Record w/ transcript. (eas) |
| 11 | Jul 15 | Brief schedule issued. (opening brief due 8/14/02) (eas) |
| 12 | Aug 09 | Motion under Rule 15(b) by appellant. (served by hand |

13   Aug   12        Order dated 08/09/02 by Walsh, J., appellant's opening
                     brief is due 09/28/02. (mfm)

14   Sep   20        Letter dated 9/17/02 from Henry Glanding to Justices,
                     regarding his appeal. (eas)

15   Sep   26        Letter dated 9/26/02 from Senior Court Clerk to Lloyd
                     A. Schmid, Jr., Esquire, forwarding Mr. Glanding's
                     letter for appropriate disposition. (eas)

16   Sep   27        Motion to withdraw as counsel by Lloyd A. Schmid, Jr.,
                     Esquire. (served by hand 9/27/02) (eas)

17   Sep   27        Statement by Lloyd A. Schmid, Jr., Esquire. (served by
                     hand 9/27/02) (eas)

18   Sep   27        Appellant's opening brief and appendix under Rule
                     26(c). (served by hand 9/27/02) (eas)

19   Oct   07        State's Response to Rule 26(c) Brief. (served by hand
                     10/7/02) (eas)

20   Oct   16        Affidavit Requesting to Proceed Pro Se Pursuant to
                     Rule 26(d) (iii) by Henry Glanding. (eas)

21   Oct   21        Letter dated 10/21/02 from Senior Court Clerk to Lloyd
                     A. Schmid, Jr,. Esquire, forwarding Mr. Glanding's
                     document for appropriate disposition. (eas)

# MICHAEL W. MODICA

### ATTORNEY AT LAW
### 715 N. KING STREET, SUITE 300
### P.O. BOX 437
### WILMINGTON, DELAWARE 19899

---

**TELEPHONE (302) 425-3600**
**FACSIMILE (302) 425-5712**
**E-MAIL: MODICALAW@aol.com**

November 24, 2003

Mr. Henry Glanding
SBI # 132504
DCC
1181 Paddock Road
Smyrna, DE 19977

Dear Henry:

This is to confirm that I have scheduled a visit with you for December 8, 2003 at 9:00 a.m. to discuss your case. Please prepare all paperwork relating to this case so that we can go over it on that date. I look forward to meeting you.

Very truly yours,

Michael W. Modica

MWM/tsw
cc: Ms. Stacy Redcliffe

I obTAiNed mR. modicA oN this dATE!

4

THE CIRCUIT COURT FOR CAROLINE COUNTY, MARYLAND

STATE OF MARYLAND
v.                                          Criminal Case No.5308
MICHAEL FRANCIS KELLER

STATE OF MARYLAND
v.                                          Criminal Case No.5309
CHARLES EDWARD BAKER

STATE OF MARYLAND
v.                                          Criminal Case No. 5331
TIMOTHY WEINS
*****************************************************************************
THE DISTRICT COURT OF MARYLAND FOR CAROLINE COUNTY.

STATE OF MARYLAND
v.                                          Criminal Case No. 5J-9364
ROBERT LESLIE BROWN

STATE OF MARYLAND
v.                                          Criminal Case No. 0J-9366
DARRYL LEON POAFPYBITTY

STATE OF MARYLAND
v.                                          Criminal Case No. 0J-8393
HENRY GLANDING

## STATE'S NOTICE OF NOL PROS

The STATE ATTORNEY'S FOR CAROLINE COUNTY hereby notifies the Courts and all defense counsel that the above-captioned cases are being *nol prossed*. Any unserved warrants in those cases should be recalled. Regarding the *nol prosses*, State's Attorney Robert Greenleaf states:

"Without the presence at trial of James "Chopper" Patterson (the alleged victim), and live credible testimony from him, the law will not allow the State to convict any defendant in these cases. Despite several appointments for meetings at the State's Attorney's Office, the victim has missed all of them, including a fifth and final chance last Thurs., Mar. 21. It has foiled trial preparation. It has prevented the State's Attorney's Office from sizing up the victim, i.e., assessing the credibility of the victim and his allegations of heinous acts."

"The mere hope that the victim might show up for trial is wasteful of the time of hundreds

5

of potential jurors. And very expensive. Jurors' time is best reserved for those cases ready for trial. Because of the victim, these cases are not ready for trial and it is uncertain when they will be ready. I emphasize the *nol prosses* are through no fault of police or the State's Attorney's Office."

"The State reserves the right to re-institute the cases anytime; meanwhile, the law presumes the defendants innocent of the charges in this matter."

Any prosecutor in the Caroline County State's Attorney's Office is authorized to implement the *nol pros* contemplated in this notice.

Dated: March 25, 2002

Robert J. Greenleaf, State's Attorney
P.O. Box 59, Denton, MD 21629
410-479-0255

*Note to Victim-Witness Coordinator: Call off witnesses; copy this to victim & charging officer.*

Robert J. Greenleaf

## Certificate of Service

I certify that on March 25, 2002 a copy of the foregoing was mailed, postage prepaid, to: Jim Baldwin, Esquire, attorney for Timothy Weins, 120 W. Water St., Centreville, MD 21617; Brian Young, attorney for Michael Keller, 5407 Water St., #106, Upper Marlboro, MD 20772; C. Thomas Brown, attorney for Charles Edward Baker, 205 E. Main St., Elkton, MD 21921; Robert Leslie Brown, defendant pro se, 6801 Old Solomons Island Rd., Friendship, MD 20758; Darryl Leon Poafpybitty, defendant pro se, 4169 Cadle Creek Marina, Edgewater, MD 21037; and Henry Glanding, defendant pro se, 829 Lion Hope Rd., Clayton, DE 19938.

Robert J. Greenleaf

6

**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR KENT COUNTY**

STATE OF DELAWARE                        CR. A. NO:
       V.                                        IK01-05-0531-0557
HENRY W. GLANDING Jr.
       Defendant                              ID. NO: 0105009486

## MOTION FOR SUPRESSION OF EVIDENCE

     NOW COMES the defendant, HENRY W. GLANDING JR and respectively requests that this Honorable Court review the Affidavit of Probable Cause and Search Warrants in this case and dismiss any and all Illegally Obtained Evidence.

     In support of this motion, the following is asserted.

1) On May 11TH, 2001, defendant's 1986 Dodge Ram vehicle was rammed from behind by the Delaware State Police, as stated defendant was under a drug related investigation and was known to be wanted out of the District Court of Maryland for Caroline County.

     A) Trooper Michael W. Calloway's claim that a drug related investigation was being conducted on the defendant is an after the fact claim, a post-ram/stop and apprehension of the defendant on the basis of outstanding warrants that an illegal search (without consent or warrant) of defendant's vehicle revealed alleged narcotic's and firearm.

     B) The District Court of Maryland for Caroline County denies having warrant's on defendant.

2) The finding's within the defendants vehicle, as stated, lead to the execution of a search warrant on the defendants residence located at 829 Lion Hope Road, Clayton, Delaware, 19938.

     A) Trooper Michael W. Calloway states the execution of a search warrant, however, due to one not being presented or seen there is the question of the existence of a valid search warrant.

3) Affidavit of Probable Cause

     A) Trooper Michael W. Calloway prepared an Affidavit of Probable Cause stating the alleged facts surrounding this incident of May 11TH, 2001. However, this Affidavit completely lacks his signature under oath, but more importantly, it lacks the signature of a Judge-Master-Commissioner-Court

(continued)
Official and the seal of the Court.

**Grounds and Allegations set forth thus far:**

A) The lack of probable cause to ram/stop the defendants vehicle.

B) The Unconstitutional Search and Seizure conducted upon the defendants vehicle supplied poisonous fruit that led to the illegal non-consenting questionable execution of a valid search warrant on defendants residence.

- Although the procedure may seem a mere formality to those whose everyday job it is to obtain them, the failure to obtain a warrant in the absence of exigent circumstances is inexcusable. Ceroni V. State, 559 N.E.2d 372, 374-75 (IND. CT. APP. 1990)

-No exigency existed where there was ample time to obtain a warrant, no necessity to enter the vehicle or premises to prevent the destruction of evidence, and where police investigative strategy created exigency. United States V. Duchi 906 F.2d 1278, 1281-85 (8TH Cir. 1990); United States V. Radka 904 F.2d 357, 360-63 (6TH Cir. 1990); United States V. Suarez 902 F.2d 1466, 1467-68 (9TH Cir. 1990); Finch V. State 592 P.2d 1196, 1198 (Alaska 1979); People V. Robinson 534 N.Y.S. 2d 267, 268 (A.D. 1988)

- A search warrant provides the detached scrutiny of a neutral magistrate, which is a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer engaged in the often competitive enterprise of ferreting out crime.

C) Items seized not supported by legitimate Affidavit of Probable Cause. Weeks V. United States 232 U.S. 383 (1914) 367 U.S. at 655. Mapp V. Ohio 367 U.S. 643 (1961)

- A false Affidavit generally renders a Search Warrant invalid and the fruits of any search made pursuant to it are generally suppressible.

- A Magistrate or Judge in issuing a warrant was mislead by information in an Affidavit that the Affiant knew was false or would have known was false except for his reckless disregard of the truth.

IN CONCLUSION, this Motion clearly portrays the lack of Probable Cause, Unconstitutional Search and Seizures, and Deliberate Reckless Disregard of the Truth.

WHEREFORE, the Defendant prays that this Honorable Court suppress the unconstitutionally collected evidence and relating indictments

(continued)

with prejudice.

I SOLEMLY DECLARE AND AFFIRM UNDER THE PENALTIES OF PERJURY THAT THE INFORMATION PROVIDED HEREIN IS TRUE AND ACCURATE TO THE BEST OF MY KNOWLEDGE, INFORMATION, AND BELEIF.

Respectfully Submitted,

Henry W. Glanding Jr.

9

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
# IN AND FOR KENT COUNTY

HENRY W. GLANDING JR.
      PLAINTIFF            CR. A. NO:
      V.                 IK01-05-0531-0557

STATE OF DELAWARE
      DEFENDANT      I.D. NO: 0105009486

## ORDER

    IT IS HEREBY ORDERED, this _____ day of _____, 2001
that the attached Motion for Suppression Of Evidence has been read and
considered.

    IT IS ORDERED that the Motion is hereby GRANTED/DENIED.

    IT IS FURTHER ORDERED THAT _____

_____

_____.


                                 _____

                                      JUDGE

10

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
## IN AND FOR KENT COUNTY

STATE OF DELAWARE                    CRIMINAL ACTION NO:
         V.                              IK01-05-0531-0557
HENRY W. GLANDING Jr.
      Defendant                      ID NO: 0105009486

### <u>NOTICE OF MOTION</u>

     PLEASE TAKE NOTICE, that the enclosed MOTION FOR
SUPRESSION OF EVIDENCE will be presented to this Honorable Court at
the earliest possible convenience.

<u>November 10TH, 2001</u>
    Date

MR. Henry W. Glanding Jr.
S.B.I.# 00132504
Delaware Correctional Center
1181 Paddock Road
Smyrna, Delaware 19977

## CERTIFICATE OF SERVICE

I, Henry W. Glanding Jr. hereby certify that I have served a true and correct copy of the attached: "Motion for Suppression of Evidence" upon the following person:

TO: Prothonotary of the Superior Court
Kent County Courthouse
38 The Green
Dover, Delaware, 19901

By placing same in sealed envelope and depositing same in the United States mail at the Delaware Correctional Center, 1181 Paddock Road, Smyrna, Delaware, 19977; postage paid by petitioner.

On this 10th day of November, 2001.

Henry W. Glanding

12      Sent to: A. G. Office

## CERTIFICATE OF SERVICE

I, Henry W. Glanding Jr. hereby certify that I have served a true and correct copy of the attached: "Motion for Suppression of Evidence" upon the following person:

TO: Office of the Attorney General
Department of Justice
102 W. Water St.
Dover, Delaware, 19901

By placing same in sealed envelope and depositing same in the United States mail at the Delaware Correctional Center, 1181 Paddock Road, Smyrna, Delaware, 19977; postage paid by petitioner.

On this 10th day of November, 2001.

Henry W. Glanding

sent to: Prothonotarys
Office

13

## CERTIFICATE OF SERVICE

I, Henry W. Glanding Jr. hereby certify that I have served a true and correct copy of the attached: "Motion for Suppression of Evidence" upon the following person:

TO:  Office of the Attorney General
      Department of Justice
      102 W. Water St.
      Dover, Delaware, 19901

TO:  Prothonotary of the Superior Court
      Kent County Courthouse
      38 The Green
      Dover, Delaware, 19901

By placing same in sealed envelope and depositing same in the United States mail at the Delaware Correctional Center, 1181 Paddock Road, Smyrna, Delaware, 19977; postage paid by petitioner.

On this 10th day of November, 2001.

*Henry W. Glanding*
Henry W. Glanding

Lloyd A. Schmid Jr
OFFicE OF the Public DEfeNdERS
530 South STATE STREET
DOVER DEL. 19901

14

Sort to. Lawyer

# MICHAEL W. MODICA
**ATTORNEY AT LAW**
**715 N. KING STREET, SUITE 300**
**P.O. BOX 437**
**WILMINGTON, DELAWARE 19899**

---

**TELEPHONE (302) 425-3600**
**FACSIMILE (302) 425-5712**
**E-MAIL: MODICALAW@AOL.COM**

July 29, 2005

Mr. Henry Glanding
SBI #132504
Delaware Correctional Center
1181 Paddock Rd.
Smyrna, DE 19977

Dear Henry:

Enclosed please find proposed legislation to clear any confusion regarding the meaning of the term "possession" for purposes of the offense of Possession of a Deadly Weapon by Person Prohibited. This legislation was clearly the result of the issue raised in your appeal. This is for your information.

I am waiting for Judge Vaughn to rule on the Commissioner's proposed decision. I will let you know as soon is a decision is issued.

Very truly yours,

Michael W. Modica

MWM/tss

15

2-COPIES

# State of Delaware
### The Official Website for the First State

Visit the Governor | General Assembly | Courts | Other Elected Officials | Federal, State & Local Sites

Directory | Help | Search Delaware:                    Citizen Services | Business Services | Visitor Info.

General Assembly

**◀ Back**

### 143rd General Assembly
### *House Bill # 164*

**Primary Sponsor:** Schwartzkopf

**CoSponsors:** Reps. Buckworth, DiPinto, Ewing, Hudson, Keeley, Lee, Spence, Williams; Sens. Adams, Blevins, Bunting, Simpson, Vaughn

**Introduced on :** 05/04/2005

**Long Title:** AN ACT TO AMEND TITLE 11 OF THE DELAWARE CODE RELATING TO POSSESSION OF WEAPONS.

**Synopsis:** This Act adds clarity to the sections of the Delaware Criminal Code that prohibit certain persons from possessing firearms or ammunition or that prohibit the possession of certain types of weapons, such as sawed-off shotguns. The definition of "possession" adopted by the Act is consistent with the definition used in the Delaware Code for other types of contraband.

There has been inconsistency and overlap in the use of these definitions in cases involving possession of firearms during the commission of a felony and cases of possession or control by persons legally prohibited from doing so. This Act will alleviate this problem. The Act will not ease the requirement that in the prosecution of the former there must be sufficient evidence of more ready accessibility of a deadly weapon during the commission of a crime. However, in the latter type of case, in which the offense alleged is that a person specifically prohibited by law had control of a firearm, the possession element will be defined as it is with other illegal contraband. The same definition of possession will also be applicable to cases where possession of a weapon involved is illegal per se.

The Act also corrects a drafting error in the statute prohibiting possession of weapons with altered serial numbers.
□

**Current Status:** Stricken  On  05/10/2005

Fiscal Note: Not Required

**Full text of Legislation:** (in HTML format)    **Legis.html**

**Full text of Legislation:** (in MS Word format)    **Legis.Doc**  (You need Microsoft Word to see this document.)

**Actions History:**

May 10, 2005 - Stricken
May 04, 2005 - Introduced and Assigned to Judiciary Committee in House

myLIS

Register    Login

16

2

```
 1        IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

 2             IN AND FOR KENT COUNTY

 3   STATE OF DELAWARE      ) C.A. No. IK01-10-0159
                            ) through 0173
 4                          )
     vs.                    )
 5                          )
     HENRY W. GLANDING, JR.,) Appeal No. 236, 2002
 6   I.D. No. 0105009486A   )
                            ) Suppression Hearing
 7        Defendant.        ) March 4, 2002

 8                        * * * * *

 9   BEFORE:  HON. HENRY DUPONT RIDGELY, PRESIDENT JUDGE

10                        * * * * *

11   APPEARANCES:

12             MARTIN B. O'CONNOR, ESQUIRE
               Deputy Attorney General
13             on behalf of the State of Delaware.

14             LLOYD A. SCHMID, ESQUIRE
15             Assistant Public Defender
               Attorney for Defendant.
16

17

18        TRANSCRIPT OF SUPPRESSION HEARING
                     Volume A
19             Monday, March 4, 2002

20

21             SHEILA A. DOUGHERTY
               Official Court Reporter
22

23
```

SHEILA A. DOUGHERTY
Official Court Reporter

---

```
 1                INDEX TO TESTIMONY

 2   PLAINTIFF'S WITNESSES:                    PAGE

 3   RODNEY LAYFIELD

 4   Direct By Mr. O'Connor . . . . . . . . . . .    9

 5   Cross By Mr. Schmid . . . . . . . . . . .      15

 6   Redirect By Mr. O'Connor . . . . . . . . .     22

 7   DARREN SHORT

 8   Direct By Mr. O'Connor . . . . . . . . . . .   24

 9   Cross By Mr. Schmid . . . . . . . . . . .      32

10   Redirect By Mr. O'Connor . . . . . . . . .     37

11   MICHAEL CALLOWAY

12   Direct By Mr. O'Connor . . . . . . . . . . .   38

13   Cross By Mr. Schmid . . . . . . . . . . .      50

14   Redirect By Mr. O'Connor . . . . . . . . .     60

15   ROBERT KRACYLA

16   Direct By Mr. O'Connor . . . . . . . . . . .   62

17   Cross By Mr. Schmid . . . . . . . . . . .      79

18   Redirect By Mr. O'Connor . . . . . . . . .     88

19   Recross By The Court . . . . . . . . . . .     90

20   Recross By Mr. Schmid . . . . . . . . . .      91

21

22

23
```

SHEILA A. DOUGHERTY
Official Court Reporter

---

3

```
 1                INDEX OF EXHIBITS

 2   STATE'S EXHIBITS:            For id  In ev.

 3   B                            28      43

 4   C and D                      74

 5   E                            77

 6   2                                    28
     3                                    44
 7   4 and 5                              76
     6                                    78
 8   DEFENDANT'S EXHIBITS:

 9   A                            17

10

11

12

13

14

15

16

17

18

19

20

21

22

23
```

SHEILA A. DOUGHERTY
Official Court Reporter

---

4

```
 1                        Courtroom No. 2
                          March 4, 2002
 2                         1:00 p.m.

 3   PRESENT:  As noted.

 4                        * * * * *

 5             MR. O'CONNOR:  Good afternoon, Your Honor.

 6        THE COURT:  Good afternoon.

 7             MR. O'CONNOR:  Your Honor, the State has

 8   what I believe to be necessary witnesses here and is

 9   ready to proceed.

10        THE COURT:  All right.  State the basis

11   for your motion, Mr. Schmid.

12        MR. SCHMID:  Thank you, Your Honor.

13        It is my understanding that on May 11 of

14   last year Mr. Glanding was stopped by the police in

15   a manner involving striking his truck with a car in

16   order to stop the -- physically stop the vehicle so

17   it could not move.  They then dragged him out of the

18   driver's side window of the vehicle, didn't open

19   the -- didn't allow him an opportunity to leave on

20   his own, didn't draw their guns, point them at him

21   and make him sit there, and then conducted a

22   warrantless search of the vehicle.  They did this on

23   the asserted basis of having knowledge of arrest
```

SHEILA A. DOUGHERTY
Official Court Reporter

*[handwritten left margin: SEARCH WARRANT WAS Challenged]*

**Column 1 (left, page 6):**

1 warrants in Maryland.

2      We challenge the search of the vehicle on

3 that basis. It is our understanding that a weapon

4 and small quantity of methamphetamines were

5 discovered, not in plain sight, in the vehicle, not

6 directly on his person.

7      In addition, Your Honor, there was a

8 search made at his residence, and we challenge the

9 valid issuance or the circumstances of the issuance

10 of the search warrant in relation to the timing of

11 the search of the residence and assert that the

12 State did not have a sufficient finding of probable

13 cause to search made by a neutral judicial officer

14 at the time that they conducted the search.

15      THE COURT: All right. Mr. O'Connor.

16      MR. O'CONNOR: Thank you, Your Honor.

17 Just briefly.

18      Your Honor, the State intends to present

19 evidence that the state police earlier in the day on

20 May 11, 2001 had received information that the

21 defendant was wanted out of the State of Maryland

22 for several felony offenses. They also had

23 information that the defendant was known to carry a

1 firearm and had made statements which are listed in

2 the search warrant signed by this Court that the

3 defendant, if stopped by the police, would kill the

4 officer and dispose of the body.

5      Subsequent to that information, the State

6 Police had two sniper slash surveillance people in

7 the front and rear of the defendant's residence in

8 the woods. They observed the defendant that

9 afternoon with a handgun on his right hip, with a

10 black holster with a brown wooden handle, confirming

11 the fear that the defendant was armed. They

12 observed him going back and forth from his house and

13 doing some yard work.

14      *At approximately 1:30 in the afternoon the

15 Maryland warrant was issued. The testimony will

16 show that between 3:00 and 4:00 p.m. Detective

17 Calloway, who is seated to my right, and Detective

18 Boulerice appeared before Judge Vaughn with a search

19 warrant for the defendant's residence. The search

20 warrant for the residence does not in any way rely

21 on any of the Maryland warrant information, and in

22 fact the State Police is independent from it. After

23 reviewing the probable cause in that warrant, Judge

*[handwritten right margin at line 20: Not maryland]*

*(7)*

1 Vaughn signed the search warrant and sealed it for

2 30 days.

3      Subsequently Detective Calloway and

4 Detective Boulerice left the courthouse and

5 responded to a staging area which was the State

6 Police fire range. At that time they briefed

7 everyone involved in the stop of the defendant and

8 the search of the residence of not only the

9 defendant, his history, but his present

10 dangerousness.

*[handwritten left margin: From maryland *]*

11      Subsequently the car was stopped at

12 approximately 8:29 p.m. pursuant to the arrest

13 warrant from the State of Maryland. At

14 approximately 8:40 or 8:50 p.m. that evening, the

15 police then executed the search warrant on the

16 defendant's residence.

17      It is the State's position that the stop

18 of the vehicle was valid and that it was a felony

19 stop pursuant to a valid warrant from the State of

20 Maryland, that the search of the vehicle was valid

21 either because it was incident to arrest, or that it

22 fits the automobile exception, or that it was an

23 inventory search of the vehicle subsequent to his

*[handwritten left margin: ENTERED my House 9:00 TO 9:30 PM]*

*[handwritten vertical between columns: WENT INTO NIGHT TIME WARRANTLESS SEARCH]*



**Column 2 (right, page 8):**

1 apprehension, and the State does not find any fault

2 in the timing of the search warrant and the

3 residence, and therefore believes that all of the

4 evidence seized from the defendant and his vehicle

5 and from his residence that day should not be

6 suppressed, and that the police in fact did not

7 violate the defendant's Fourth Amendment rights.

8      THE COURT: All right. You may call your

9 witness.

10      MR. O'CONNOR: The State first calls

11 Corporal Rodney Layfield.

12      THE COURT: Do you have a copy,

13 Mr. O'Connor, of the application and warrant, and

14 can counsel stipulate to that admission so I can

15 have that?

16      MR. O'CONNOR: The Maryland warrant or the

17 State of Delaware warrant?

18      THE COURT: I am talking about the search

19 warrant that Judge Vaughn signed.

20      Swear the witness.

21

22

23



*[handwritten bottom center: 18]*

Rodney Layfield - Direct

\* \* \* \* \*

RODNEY LAYFIELD

\* \* \* \* \*

4  called as a witness on the part and behalf

5  of the State, being duly sworn, was

6  examined and testified as follows:

7  MR. SCHMID:  Your Honor, with respect to

8  the Court's request, I stipulate that that is a copy

9  of the document that I have been provided by the

10  State.

11  MR. O'CONNOR:  If I can pass it to Your

12  Honor.

13  THE COURT:  All right.  Hand it to the

14  clerk.  It will be marked as a State's Exhibit.

15  THE CLERK:  Marked as State's Exhibit 1.

16  THE COURT:  Mr. O'Connor.

17  MR. O'CONNOR:  Thank you, Your Honor.

18  DIRECT EXAMINATION

19  BY MR. O'CONNOR:

20  Q.  Corporal Layfield, how long have you been

21  employed by Delaware State Police?

22  A.  I have been employed with Delaware State

23  Police for approximately eight years.

SHEILA A. DOUGHERTY
Official Court Reporter

---

10

Rodney Layfield - Direct

1  Q.  Can you please tell Judge Ridgely briefly

2  what your current assignment is?

3  A.  My current assignment now is a detective

4  with the Governor's Task Force in Sussex County, and

5  in addition to that as my regular assignment I am

6  currently a scout observer for the Special

7  Operations Response Team.  Basically that is the

8  name for a sniper.

9  Q.  Have you received any particularized

10  training in observation or sniper activity?

11  A.  Yes, I have.  Basic course was a

12  three-week course.  I received the advanced course

13  and several other additional courses in shooting,

14  but also as an intelligence gathering operations.

15  Q.  Were you working on May 11, 2001?

16  A.  Yes, sir, I was.

17  Q.  Can you tell Judge Ridgely where you were

18  on that day?

19  A.  I was in a position behind a residence,

20  approximately 180 yards behind it, and I was in the

21  western part of Kent County, an area I am not really

22  familiar with.

23  Q.  Was it on Lion Hope Road?

SHEILA A. DOUGHERTY
Official Court Reporter

---

11

Rodney Layfield - Direct

1  A.  Yes.

2  Q.  When were you deployed to that location?

3  A.  Earlier on the afternoon of I believe it

4  was May 11.  Is that the correct --

5  Q.  That's correct.

6  A.  Earlier that afternoon.  I am not sure of

7  the exact time, but I believe we were put in

8  position around one o'clock or so that afternoon.

9  Q.  Were you -- prior to being deployed there,

10  were you briefed about the defendant or his

11  activities?  What did you know about him?

12  A.  Yes, we were.  We were basically briefed.

13  We were provided a picture.  We were basically told

14  of an incident that occurred involving the subject.

15  We were given his name, a physical description, and

16  also the residence at hand, and we were explained

17  that he was wanted I believe out of the state of

18  Maryland at that time.

19  Q.  Did you at any point during your

20  observation see the defendant?

21  A.  Yes, we did.

22  Q.  Can you explain to the Judge what you saw?

23  A.  Basically what I was observing was the

SHEILA A. DOUGHERTY
Official Court Reporter

---

12

Rodney Layfield - Direct

1  back of the residence.  I was unable to see anything

2  directly in front of the residence.  From my angle I

3  could kind of see one side of the house, but

4  basically I was observing the back of the house.

5  I observed him in the back yard on

6  throughout the afternoon.  It appeared to me that he

7  was tending to his garden.  I observed him with a

8  hoe, and a rake, in the back yard.  I even observed

9  him put up tomato cages or tomato stands in the back

10  yard, it appeared to me.  He was doing a lot of yard

11  work.

12  I even observed him walking around the

13  back yard with a fish in his hands, and while he was

14  doing this, he was clothed with denim shorts.  It

15  appeared like he had blue jean shorts on.  He was

16  not wearing a shirt.  He was observed with what I

17  would -- what appeared to me to be a pistol on his

18  right hip.  It was a black holster, and from my view

19  it was a larger item on his waist.  It appeared to

20  me as if it was a pistol in a black holster.  It

21  even kind of pulled down on his shorts a little bit

22  to cant his waistline on his opposite side hip.

23  I observed a knife.  He was in the yard

SHEILA A. DOUGHERTY
Official Court Reporter

Rodney Layfield - Direct

1  for over -- I would say over an hour.  Break time,
2  maybe 15 minutes, he would go around to the front,
3  maybe half hour in the back yard.  Throughout this I
4  was trying to concentrate on exactly what was on his
5  hip, and it clearly appeared to me to be a pistol in
6  a darker black holster.
7      Q.   What is it that makes you think it was a
8  pistol as opposed to another knife on his hip?
9      A.   The sheer size of it.  On his left hip I
10 was able to see a small like a sheath for a knife.
11 But on the right side of his hip it was large,
12 covered a larger area of the hip.  Also it appeared
13 that the handle of the weapon was up around the
14 waistline, above the belt line.
15      Normally if a belt is worn -- I happen to
16 wear a Leatherman or knife on occasion when I am not
17 working, and that fits around the belt line, doesn't
18 protrude much higher than the area of a belt loop on
19 the sheath, whereas a pistol is worn about mid
20 pistol depth with the belt line where the grip is up
21 above the waistline, and I could clearly see the
22 line of this indicating that it was a pistol rather
23 than a knife.

SHEILA A. DOUGHERTY
Official Court Reporter

---

14
Rodney Layfield - Direct

1      Q.   Had you been informed when you saw it,
2  prior to seeing this, that the defendant was a
3  convicted felon?
4      A.   Yes.
5      Q.   How long were you out there?
6      A.   We were out there earlier that
7  afternoon -- I am going to approximate around
8  one o'clock -- and I was aware that the vehicle left
9  approximately 2030, about 8:30.  When the team came
10 to the residence earlier -- or later that evening,
11 that was when I was extracted.  So I am going to say
12 I was surveilling him for upwards to seven hours,
13 the back yard, maybe a little less, getting into
14 position.  I was out there a total of probably eight
15 hours approximately.
16      Q.   Was anybody with you?
17      A.   Yes.  I was assisted by Corporal Todd
18 Thomas.  We deployed two people in the woods at a
19 time.  I was a surveillance position of the back,
20 also there was a surveillance position on the front
21 of the house across the street, and that was two
22 other detectives, a Detective Corporal John Piser
23 and also Corporal Darren Short.

SHEILA A. DOUGHERTY
Official Court Reporter

---

15
Rodney Layfield - Direct

1      MR. O'CONNOR:  No further questions for
2  this witness.
3      THE COURT:  You may cross-examine.
4          CROSS-EXAMINATION
5  BY MR. SCHMID:
6      Q.   Is it Lightfield?
7      A.   Layfield.  L-A-Y-F-I-E-L-D.
8      Q.   Officer Layfield, you were deployed across
9  the line in Maryland, weren't you?
10     A.   I believe we were close to the Maryland
11 line.  If we may have been deployed in Maryland, I
12 am not totally aware of that, sir.
13     Q.   All right.  How many males did you see in
14 that area, while male subject?
15     A.   That day?
16     Q.   Yes.
17     A.   One.
18     Q.   One.  Okay.  You indicated that he was in
19 the yard for over an hour.  Can you tell the Court
20 what time it was that you observed him in the yard?
21     A.   I seem to think the most activity was
22 between four o'clock and eight o'clock.
23     Q.   When you saw him for approximately an

SHEILA A. DOUGHERTY
Official Court Reporter

16
Rodney Layfield - Cross

1   hour, was your testimony doing yard work?
2        A.   At least an hour consistently he was in my
3   view.  He was outside of the residence off and on
4   for I would say approximately a three-hour period.
5   I am not sure, because I didn't document time.
6   Trying to recall, but there was approximately a
7   three-hour period where he was in and out and around
8   the house and directly in my view in the back yard.
9   I had observation for him for at least an hour, I
10  would say, directly in my view.
11       Q.   You didn't see him leave the residence at
12  any time while you were there surveilling him for
13  that seven-hour period?
14       A.   I was aware of the surveillance that was
15  going on in front of the residence by the other
16  snipers that were in position.
17       Q.   My question is:  From the 13 --
18  approximately 1300 time when you were inserted until
19  you finished your surveillance, approximately seven
20  hours later, you did not see him leaving the
21  residence during any of that period of time.  I am
22  talking about leave his yard, drive off; correct?
23       A.   At the end of my surveillance at

SHEILA A. DOUGHERTY
Official Court Reporter

17
Rodney Layfield - Cross

1   approximately 8:30 or so, I was aware of a vehicle
2   that left the front of the residence.  My view only
3   indicated that a vehicle left the residence.
4        Q.   Okay.  Now, you indicated that he was
5   wearing shorts, no shirt?
6        A.   Correct.  When he was doing garden work,
7   sir.
8        MR. SCHMID:  Your Honor, I have shown the
9   photograph that I would like the officer to look at.
10  I would like to have an item marked for
11  identification.  I am showing that to Mr. O'Connor.
12       THE COURT:  Hand it to the clerk and mark
13  it for identification.
14       THE CLERK:  It has been marked as Defense
15  Identification A.
16       (Defendant's Exhibit A marked for
17  identification.)
18       MR. SCHMID:  Approach the witness, Your
19  Honor?
20       THE COURT:  Yes.
21  BY MR. SCHMID:
22       Q.   I show you a photograph marked Defense for
23  Identification A and ask what you -- if that

SHEILA A. DOUGHERTY
Official Court Reporter

18
Rodney Layfield - Cross

1   photograph in any way depicts what you saw on that
2   day, an individual without a shirt on, with
3   something on his belt?
4        A.   It appears to be an individual without a
5   shirt on, and he has blue jeans on, and he has a
6   dark item -- from the picture itself, it appears to
7   be a holster or a sheath for a knife.  And the only
8   reason why I would judge it that way is I can
9   clearly see a silver metal button on it.
10       This is different than what I observed
11  from my position, I believe.  I cannot see, as I
12  described earlier, the handle of a pistol.  What I
13  see here is it appears to be a sheath of a knife on
14  the right hip of this subject.
15       Q.   You were approximately 180 yards away, you
16  said?
17       A.   Yes, sir.
18       Q.   That's an approximation, right?
19       A.   Yes, sir.
20       Q.   Could have been further away?
21       A.   I would say my range estimating, I am
22  within 20 yards of the worst case.
23       Q.   So would have been 140 yards away?  You

SHEILA A. DOUGHERTY
Official Court Reporter

19
Rodney Layfield - Cross

1   said you are within 20 yards.
2        A.   Yes, sir.
3        Q.   So in other words, if you say you were 120
4   yards away, and you are off by perhaps 20 at the
5   most, you just said you could have been off by as
6   much as 20 yards?
7        A.   I believe I said I was about 180 yards.
8        Q.   I am sorry?
9        A.   Plus or minus 20 would be from 160 to 200.
10       Q.   Exactly.  I am sorry.
11       A.   Yes, sir.
12       Q.   Thank you.  And you were observing the
13  individual at this residence by what means?
14       A.   I was aided by ocular device, and it was
15  powered up to ten power.
16       Q.   Okay.  Now, that --
17       MR. SCHMID:  May I retrieve the
18  photograph, Your Honor?
19       THE COURT:  Yes.
20  BY MR. SCHMID:
21       Q.   At ten power at 200 -- 180 to 200 yards
22  away, your sight picture would have shown an
23  individual smaller than what is depicted in this

SHEILA A. DOUGHERTY
Official Court Reporter

21

Rodney Layfield - Cross

```
1   photograph, correct?
2          Do you need to see that again?  I am
3   sorry.
4      A.    I would say I can't judge the size of what
5   I view at 200 yards with ten power versus that
6   picture, but I can -- if I can explain, my view
7   would be a consistent view like a video camera or
8   live action where I can catch different angles to be
9   able to depict an item, whereas that picture just
10  gives me one view that I can't really scan or get a
11  3-D look, and that inhibits me from observing what
12  is on that hip or describing what is on that hip.
13     Q.    Of course, except that when you are lying
14  like it was a sight or spotting scope.  Which was
15  it?
16     A.    A scope, sir.
17     Q.    On the rifle itself?
18     A.    Yes, sir.
19     Q.    So you were looking through a rifle scope
20  at ten power?
21     A.    Yes, sir.
22     Q.    What is the highest power that the scope
23  would go up to?
```

```
1      A.    It is a three by ten scope.
2      Q.    The highest was ten?
3      A.    Yes, sir.
4      Q.    You hit at the highest, and this scope
5   does not give you what one might call a crystal
6   clear picture at ten power; correct?  At a distance
7   of 200 yards?
8      A.    It is a clear view.  I am not sure of your
9   definition of crystal clear, but it is a scope that
10  we use and is highly rated among scopes.  It is a
11  Leopold scope, which is high quality, and it gives a
12  clear image, as clear as possible, on ten power at
13  that distance.
14     Q.    Your assertion is that you cannot say
15  whether the size of the man that you were looking at
16  in the scope would have been smaller than what you
17  saw in this photograph?
18     A.    I am unable to compare my view through the
19  scope to that picture, sir.
20     Q.    What was the weather like that day?
21     A.    Extremely hot, and mosquitoes from my
22  position were terrible.
23     Q.    How was the lighting?  Was it cloudy?  Was
```

22
Rodney Layfield - Cross

```
1   it --
2      A.    There was enough light for me to clearly
3   see his residence.  I don't recall it raining at all
4   that day.  I don't recall any bad weather that day
5   per se.  Nothing inhibited my view.  I can't tell
6   you exactly the weather.  It is not fresh in my
7   mind.  It was a warm day, and it was clear view.
8          MR. SCHMID:  Okay.  Nothing further, Your
9   Honor.
10         THE COURT:  Mr. O'Connor.
11            REDIRECT EXAMINATION
12  BY MR. O'CONNOR:
13     Q.    You indicated to Mr. Schmid that he asked
14  you a question whether the defendant had left his
15  residence at some point while you were watching?
16     A.    Yes.
17     Q.    Did you have a clear view of the front of
18  the residence?
19     A.    I did not.
20     Q.    Is that why you don't know what he was
21  doing out front?
22     A.    With my view, I am able to tell you that I
23  believe what occurred because I was able to hear the
```

23
Rodney Layfield - Redirect

```
1   transmissions of the radios through the other guys
2   and the direction of travel I saw the subject walk.
3   However, I did not clearly see him get in the
4   vehicle and leave from my vantage point.
5      Q.    And that was around 8:40 p.m.?
6      A.    Yes.
7      Q.    What was the lighting like at that point?
8      A.    It was starting to get -- it was starting
9   to get darker that evening.
10         MR. O'CONNOR:  No further questions.
11         MR. SCHMID:  Nothing further, Your Honor.
12         THE COURT:  You may step down.
13         THE WITNESS:  Thank you, Your Honor.
14         (The witness stepped down.)
15         MR. O'CONNOR:  State calls Detective
16  Darren Short.
17                * * * * *
18            DARREN SHORT
19                * * * * *
20         called as a witness on the part and behalf
21         of the State, being duly sworn, was
22         examined and testified as follows:
23
```

22

**Page 25 (left):**

1       DIRECT EXAMINATION
2   BY MR. O'CONNOR:
3       Q.   Good afternoon, Detective Short.
4       A.   Afternoon.
5       Q.   Detective Short, how long have you worked
6   for Delaware State Police?
7       A.   Approximately eight and a half years.
8       Q.   What is your current assignment?
9       A.   Currently assigned to the Special
10  Investigations Unit of the Delaware State Police,
11  and also as a sniper observer for the Delaware State
12  Police Special Operations Response Team.
13      Q.   Have you received any particular training
14  in sniper observation work with respect to your SORT
15  group?
16      A.   Yes.  I have attended both basic and
17  advanced schools in sniper observing.
18      Q.   Were you working on May 11, 2001?
19      A.   Yes, I was.
20      Q.   What was your assignment that day?
21      A.   I was assigned as a sniper to set up
22  surveillance on a residence and observed the actions
23  of Henry Glanding prior to a search warrant being

SHEILA A. DOUGHERTY
Official Court Reporter

**Page 25 (right):**

1   executed on the residence.
2       Q.   Who were you working with that day?
3       A.   Corporal John Piser.
4       Q.   Where were you located in relation to the
5   defendant's house?
6       A.   I was straight off his front door in a
7   woodline across the field.
8       Q.   Approximately how far away were you from
9   his residence?
10      A.   Approximately 375 yards.  We hit it with a
11  range finder.
12      Q.   When were you deployed to that location?
13      A.   Between one and two o'clock we were
14  deployed, and it took us probably 45 minutes to work
15  into position.
16      Q.   Prior to being deployed, were you briefed
17  on the defendant or his prior activities?
18      A.   Yes, I was.
19      Q.   Can you tell the Judge what you knew of
20  the defendant at that time?
21      A.   We knew that there were arrest warrants
22  for the defendant out of Maryland.  I knew that
23  Special Investigations Unit was preparing or had

SHEILA A. DOUGHERTY
Official Court Reporter

---

26

Darren Short - Direct

1   search warrants for the residence, that he had a
2   violent history, and that he was a prohibited felon.
3       Q.   Did you observe the defendant at any point
4   on May 11, 2001?
5       A.   Yes, I did.  From our position I was using
6   a four and a half by fourteen Leopold scope mounted
7   to a 700 Remington rifle for observation purposes.
8   I was able to observe the defendant exiting his
9   residence, working in the yard, back and forth to
10  his vehicles.
11          During the course of my observations I
12  observed him around five o'clock.  He came out of
13  his residence, with blue jean shorts on, and a
14  handgun on his right hip.
15      Q.   What made you believe it was a handgun?
16      A.   Through the scope you could see that there
17  was a black holster and the handle coming out of the
18  holster, which was to my observation, from my
19  schools, it was a handgun on his right hip.  We
20  observed him doing routine activities in the yard,
21  carrying it on his right hip.
22      Q.   Was there anything about the position of
23  the gun or the gun itself that led you to believe it

SHEILA A. DOUGHERTY
Official Court Reporter

**Page 27 (right):**

27

Darren Short - Direct

1   wasn't a knife or some other object?
2       A.   You could tell it was weighting down on
3   the right side which caused the shorts to slide a
4   little bit to the right.  When you wear a gun, the
5   weight will pull on the right side.  Also just with
6   the shape of the handle coming out of the holster,
7   it was very distinctive.
8       Q.   Can you describe the -- your vision that
9   day in relation to whether it was blocked or what
10  the weather was like?
11      A.   We had a clear vision.  I had my rifle
12  mounted on a tree branch in the tree line.  I was
13  unobstructed by any trees or anything.  I had low
14  crops all the way from the tree line to the roadway,
15  and then to his house.  The day before I had been in
16  that position and we took video and I believe photos
17  were made of that from my position.
18          MR. O'CONNOR:  Your Honor, if I could have
19  one second.  If I could have an item marked for
20  identification.
21          THE COURT:  Mark the item for
22  identification, Mr. Clerk.
23

SHEILA A. DOUGHERTY
Official Court Reporter

Darren Short - Direct

29

Darren Short - Direct

1  THE CLERK: It has been marked as State's

2  for Identification B.

3  (State's Exhibit B marked for

4  identification.)

5  BY MR. O'CONNOR:

6  Q.  Detective Short, I am going to hand up

7  what has been marked as State's A.  Do you recognize

8  that?

9  A.  Yes.  That is the residence we were set up

10 on.  That was the view I had from my position.

11 MR. O'CONNOR:  Your Honor, at this point

12 the State would move State's for Identification A as

13 State's Exhibit 2.

14 THE COURT:  Any objection?

15 MR. SCHMID:  No objection, Your Honor.

16 THE COURT:  It is admitted.  Mark it as an

17 exhibit.

18 THE CLERK:  It has been marked as State's

19 Exhibit 2.

20 (State's Exhibit 2 received into

21 evidence.)

22 BY MR. O'CONNOR:

23 Q.  Detective Short, looking at State's

1  Exhibit 2 again, does that depict the same general

2  area you were in on May 11?  That video was taken

3  May 10?

4  A.  Yes.  The photograph was taken May 10.  We

5  were back in the same location May 11.

6  Q.  What kind of video camera were you using

7  at the time?

8  A.  A Sony Handycam.  I am not sure what the

9  magnification was on it.

10 Q.  But that is from 375 yards?

11 A.  Yes.  That is from our position, and it

12 was zoomed in to cover the front of the house.

13 Q.  Did you observe the defendant leave the

14 residence?

15 A.  Throughout the day, throughout our

16 observation we observed him several times walking

17 around the yard.  I watched him come out his front

18 door and clean his fish.  He took a picture of his

19 fish, a Polaroid picture of him.  We observed him do

20 that and take the picture back inside and clean the

21 fish and go around the other side of the house.

22 When he went out of our sight according to

23 the picture, the right side of the house, Corporal

SHEILA A. DOUGHERTY
Official Court Reporter

SHEILA A. DOUGHERTY
Official Court Reporter

---

Darren Short - Direct

30

1  Layfield and his partner was there to pick up where

2  we left off.  We were to observe him when he was

3  outside the residence.

4  Q.  At approximately what time did the

5  defendant ultimately leave his residence?

6  A.  Yes.  He left the residence at

7  approximately 2029 hours. *this one, his two*

8  Q.  Which is 8:30? *is covering with 155 times*

9  A.  (8:30, approximately.  (8:39.)  Prior to him

10 leaving, we observed him actually in the vehicle.

11 There is a Ram Charger, and it was parked in about

12 the same place.  I can't say exactly the same place,

13 but a little bit to the left of the doorway, that

14 day, on the 11th, observed him going back and forth

15 in and out of the house to the Ram Charger.  And he

16 changed clothing and put on a dark-colored tee shirt

17 and jeans, and was moving back and forth to the

18 vehicle prior to leaving.  Then he ended up back out

19 of the driveway and heading southbound on the

20 roadway.

21 Q.  Did you have a clear view to whether he

22 was putting specific objects in the vehicle?

23 A.  I could see him going back and forth, but

1  actually you can see from the picture when he comes

2  out the door, his right side, when he comes to the

3  driver's side, he is going to be blocked from me, so

4  I could see him moving.  I could see him going in

 *No Gov*

5  and out of the car, but I can't actually see what he

6  has in his hand due to the blocking from the other

7  vehicles, and just in the proximity we were to where

8  the vehicle was sitting, just cross, you know,

9  you could see above the car into it.

10 Q.  Were you communicating your observations

11 to other state police officers during this time?

12 A.  We were steadily communicating to the

13 Special Investigation Unit officers that were there

14 to take notice during the investigation, and also to

15 the sniper team leaders and the people that were --

16 the SORT Team leaders that were preparing for the

17 arrest of the subject.

18 Q.  Once the defendant left his residence,

19 what did you do?

20 A.  When he went out, as soon as his vehicle

21 left my sight we stayed on the house to maintain

22 that no one else entered the residence, so we

23 covered the whole front, and which is we counted to

SHEILA A. DOUGHERTY
Official Court Reporter

31

Darren Short - Direct

1  be one side had the front and right side of the

2  residence, and we allowed the other snipers to cover

3  the back to make sure no one entered the residence

4  prior to state replying.

5      Q.   You had the same position?

6      A.   Right.  We had the same position.  As soon

7  as the vehicle left our position, we left.

8  Surveillance units picked them up and we maintained

9  the house, which was our primary assignment.

10         MR. O'CONNOR:  No further questions.

11         THE COURT:  You may cross-examine.

12              CROSS-EXAMINATION

13  BY MR. SCHMID:

14     Q.   Officer Short, that photograph that has

15  just been admitted into evidence by the State,

16  State's 2.

17     A.   Um-hum.

18     Q.   That, would you say, fairly depicts what

19  your sight picture was the next day?

20     A.   No, not through the -- I could zoom, this

21  was zoomed out to -- I could take the whole -- when

22  I shot this video I zoomed out to I could get the

23  whole front of the house.  My scope will zoom in a

1  lot closer than that 214 power scope that I was

2  using, so I can get a lot closer to this if that is

3  what you mean.

4      Q.   During the course of your observations you

5  were in radio communication with other officers?

6      A.   Yes, I was.

7      Q.   Did that include Corporal Calloway?

8      A.   Yes, it did.

9      Q.   And you reported to Corporal Calloway your

10  observations concerning a possible weapon on his

11  hip; correct?

12     A.   That's correct.  I reported on the same --

13  the frequency I was using was going to the members

14  of the Special Investigation and also the SORT Team

15  members.

16     Q.   And you recall telling or broadcasting out

17  on this joint frequency that you observed what you

18  thought was a pistol on his hip?

19     A.   Numerous times.

20     Q.   Not absolutely certain, it is a pistol, it

21  can be nothing else; correct?

22     A.   I said -- actually, at one point I said it

23  is a gun, I said it appeared to be a gun, appears to

1  be a gun, it is a gun.  I drew the conclusion it was

2  a gun.

3          MR. SCHMID:  Your Honor, may I approach

4  the witness?

5          THE COURT:  Yes.

6  BY MR. SCHMID:

7      Q.   I hand you what has been marked Defense

8  for Identification A.  Ask you to take a look at

9  that.

10     A.   Um-hum.

11     Q.   Notice an individual there in the

12  photograph?

13     A.   Yes.

14     Q.   His back is to you?

15     A.   Um-hum.

16     Q.   No shirt?

17     A.   Um-hum.

18     Q.   Appears to have something on his hip;

19  correct?

20     A.   Looks like a knife and a pouch.

21     Q.   Now, you were viewing this subject that

22  you are describing from 375 yards away; correct?

23     A.   Um-hum.

1      Q.   What is the range of error for that?  Are

2  you talking about within 20 yards?

3      A.   What do you mean, range of error?

4      Q.   You say it was 375 yards, but you didn't

5  pace it off?

6      A.   We used a laser range finder.

7      Q.   And that range finder is accurate to

8  within how many yards?

9      A.   It is inaccurate.

10     Q.   Did you testify --

11     A.   I can't testify to it.

12     Q.   You can't say as you sit here today that

13  it is absolutely accurate in a hundred percent

14  order?

15     A.   I would have to pull the manual.

16     Q.   As this point as you sit here -- now, from

17  that distance you observed this individual with what

18  you believed was a pistol?

19     A.   Um-hum.  A handgun.

20     Q.   A handgun.  And you never saw him pull it

21  out?

22     A.   No.

23     Q.   Never saw him with it in his hand?

36
Darren Short - Cross

1    A.   No.  On his hip.

2    Q.   Just whatever it was that you saw was

3 always on his hip, remained in whatever the --

4    A.   The holster.

5    Q.   Call it a holster, pouch, pack, whatever

6 it was you saw on his hip, it remained within that

7 on his hip the entire time?

8    A.   During my observations, yes.

9    Q.   How long did you -- during the course of

10 what, about seven hours?

11    A.   That we set up, yes.

12    Q.   During that seven-hour period that you

13 were observing him, how much of that time was he

14 actually in a position where you could observe him?

15    A.   He was in and out.  Pretty much in and out,

16 of the house from 5:00 until (9:29) when he left, he

17 was in and out of the house.  Sometimes for brief

18 moment, sometimes for longer durations.  I don't

19 know the exact, but putting it all together, how

20 long it would be.

21    Q.   Appeared to be doing a little bit of work

22 around the yard?

23    A.   He worked around the yard, cleaning fish,

SHEILA A. DOUGHERTY
Official Court Reporter

37
Darren Short - Cross

1 taking pictures of fish.

2    Q.   He appeared to be taking things out of the

3 vehicle consistent with that activity, cleaning the

4 fish?

5    A.   Yes.  He went into the rear, went into a

6 cooler on occasion.  He took the fish out of the

7 cooler in the rear of the Ram Charger.

8    Q.   Okay.

9        MR. SCHMID:  May I retrieve the

10 photograph, Your Honor?

11        THE COURT:  Yes.

12        MR. SCHMID:  If I could have a moment,

13 Your Honor.

14        Nothing further, Your Honor.

15        THE COURT:  Mr. O'Connor.

16        REDIRECT EXAMINATION

17 BY MR. O'CONNOR:

18    Q.   When you observed the defendant outside,

19 was he alone?

20    A.   Yes.

21        MR. O'CONNOR:  No further questions.

22        MR. SCHMID:  Nothing further, Your Honor.

23        THE COURT:  You may step down.

SHEILA A. DOUGHERTY
Official Court Reporter

38
Darren Short - Redirect

1        (The witness stepped down.)

2        MR. O'CONNOR:  Your Honor, may I retrieve

3 the photograph?

4        THE COURT:  You may.

5        MR. SCHMID:  Your Honor, may I return the

6 photograph marked Defense ID-A to the prothonotary?

7        THE COURT:  Mr. O'Connor.

8        MR. O'CONNOR:  Your Honor, the State next

9 calls Detective Mike Calloway.

10            * * * * *

11        MICHAEL CALLOWAY

12            * * * * *

13        called as a witness on the part and behalf

14        of the State, being duly sworn, was

15        examined and testified as follows:

16        DIRECT EXAMINATION

17 BY MR. O'CONNOR:

18    Q.   Good afternoon, Detective.

19    A.   Good afternoon.

20    Q.   Detective, how long have you been employed

21 by Delaware State Police?

22    A.   Since March of 1996.

23    Q.   What is your current assignment?

SHEILA A. DOUGHERTY
Official Court Reporter

39
Michael Calloway - Direct

1    A.   I am assigned to the Delaware State Police

2 Special Investigations Unit.

3    Q.   What does that unit focus its activities

4 on?

5    A.   Drug activity.

6    Q.   Anything else?

7    A.   Mainly stipulating drug activity, sales,

8 distribution of drugs.

9    Q.   Do you work in an undercover capacity --

10    A.   Yes.

11    Q.   -- or are you a uniformed officer?

12    A.   Yes, undercover capacity.

13    Q.   How many narcotics investigations have you

14 participated in while in the drug unit?

15    A.   Over a hundred.

16    Q.   How many search warrants have you

17 attempted to obtain or obtained while in the drug

18 unit, either as an affiant or co-affiant?

19    A.   Well over 50.

20    Q.   Were you working on May 11, 2001?

21    A.   Yes, I was.

22    Q.   Had you received information regarding the

23 defendant, Henry Glanding?

SHEILA A. DOUGHERTY
Official Court Reporter

Michael Calloway - Direct

1    A.   Yes, I did.

2    Q.   Can you explain to the Court briefly what

3    it is that you learned about the defendant prior to

4    and up until May 11, 2001?

5    A.   We had received -- I had received

6    information that the defendant kept large amounts of

7    methamphetamine in his house, was also involved in

8    distribution, and that he had numerous weapons, he

9    was an avid hunter.  On May 11 I was contacted by

10   Detective Williams, also of the Delaware State

11   Police, and was also assigned with the -- sworn in

12   with the DEA and Drug Enforcement Agency.  He

13   advised that a subject had been assaulted by several

14   members of a Pagan organization in Maryland.  And

15   one of them was the defendant, Mr. Glanding, setting

16   in the white, who is a suspect.

17   Q.   The Pagan motorcycle gang or club?

18   A.   Yes, it is a motorcycle gang.

19   Q.   Armed with this information, what did you

20   do?  Did you learn whether or not there was an

21   arrest warrant in the State of Maryland?

22   A.   Yes, I did.

23   Q.   Can you explain to the judge how you came

SHEILA A. DOUGHERTY
Official Court Reporter

---

41

Michael Calloway - Direct

1    to that information?

2    A.   First I did a confirmation hit on May 11,

3    and received a confirmation at 1438 hours on May 11

4    that the defendant was wanted for numerous felony

5    warrants out of Maryland.  Also I received a copy of

6    the actual warrant out of Maryland prior to

7    somewhere around 1700 hours after arriving at the

8    range, Delaware State Police range.

9    Q.   Let me take you back to the earlier part

10   of May 11.  At some point earlier in the day you

11   learn that the defendant was wanted on felony

12   charges; correct?

13   A.   That's correct.

14   Q.   Subsequently did you prepare a search

15   warrant or a co-affiant on a search warrant?

16   A.   That's correct.  I was a co-affiant with

17   Detective Boulerice on a search warrant for 829 Lion

18   Hope Road, which is Mr. Glanding's residence.

19   Q.   And with respect to the warrant, can you

20   tell the judge when or what you did in an effort to

21   get that warrant approved?

22   A.   It was evidence that obtained by

23   past-proven cooperating individual and also from the

SHEILA A. DOUGHERTY
Official Court Reporter

---

42

Michael Calloway - Direct

1    intelligence gathering system that the Delaware

2    State Police has.

3    Q.   What did you do to get a warrant signed?

4    Where did you go?

5    A.   I responded to Superior Court in Kent

6    County, and met with Judge Vaughn, and myself and

7    Detective Boulerice, and Judge Vaughn signed the

8    warrant.

9    Q.   Approximately what time do you recall

10   meeting with Judge Vaughn?

11   A.   Approximately 15 -- between 1500 and 1600

12   hours, three o'clock, 3:00 p.m. and 4:00 p.m.,

13   between the hours of 3:00 p.m. and 4:00 p.m.

14   Q.   Once the search warrant was signed for the

15   defendant's residence, where did you respond?

16   A.   I responded to the range in Smyrna for the

17   Delaware State Police.

18   Q.   Why?

19   A.   It was to conduct a briefing with all

20   members that was going to be involved, which

21   included SIU members and a Special Operations

22   Response Team for Delaware State Police.

23   Q.   While at the range did you receive a hard

SHEILA A. DOUGHERTY
Official Court Reporter

---

43

Michael Calloway - Direct

1    copy of the arrest warrant out of the State of

2    Maryland?

3    A.   That's correct.

4    MR. O'CONNOR:  Your Honor, may I have an

5    item marked for identification?

6    THE COURT:  You may.

7    THE CLERK:  It has been marked as State's

8    for Identification B.

9    (State's Exhibit B marked for

10   identification.)

11   MR. O'CONNOR:  May I approach the witness,

12   Your Honor?

13   THE COURT:  Yes.

14   BY MR. O'CONNOR:

15   Q.   Detective Calloway, I would like you to

16   look at what has been marked as State for

17   Identification B.  Do you recognize that document?

18   A.   Yes, I do.

19   Q.   What is it?

20   A.   It is a warrant out of the District Court

21   of Maryland for Caroline County for Henry Glanding.

22   Q.   Is that the warrant you just referred to

23   in your testimony that you received a hard copy of

SHEILA A. DOUGHERTY
Official Court Reporter

Michael Calloway - Direct

44

1    at the State Police firing range?

2        A.    That's correct.

3            MR. O'CONNOR:  Your Honor, the State would

4    move State's for Identification B as the next

5    State's Exhibit, which would be Exhibit Number 3.

6            THE COURT:  Any objection?

7            MR. SCHMID:  For purposes of this hearing,

8    no, Your Honor.

9            THE COURT:  Mark it as the next State's

10   Exhibit.

11           THE CLERK:  It has been marked as State's

12   Exhibit 3.

13           (State's Exhibit 3 received into

14   evidence.)

15   BY MR. O'CONNOR:

16       Q.    Corporal Calloway, or Detective Calloway,

17   when you received a copy of this warrant had any

18   action been taken by the State Police to arrest the

19   defendant?

20       A.    No.

21       Q.    Had a search warrant been executed at his

22   residence at this time?

23       A.    No, it had not.

Michael Calloway - Direct

45

1        Q.    And this is subsequent to you going to

2    Judge Vaughn's chambers and having a search warrant

3    signed; correct?

4        A.    That's correct.

5        Q.    After you met at -- to do a briefing at

6    the firing range, can you describe to the Judge what

7    occurred during the briefing?

8        A.    Basically we were making everybody aware

9    that the information that the defendant carried a

10   firearm, the information that he possibly carried it

11   at all times.  We also had made through a -- we

12   received information from a confidential informant

13   that he made a threat that if he was ever stopped by

14   a police officer while in possession of drugs, he

15   was going to shoot that police officer, and he even

16   went to further extent to how he would dispose of

17   the body.

18       Q.    Were you also receiving information at or

19   about this time from Detective Short regarding the

20   defendant's activities at his residence?

21       A.    That's correct.

22       Q.    And was it communicated to you that he was

23   believed to possess a firearm at that time?

46

Michael Calloway - Direct

1        A.    Yes.

2        Q.    What was the plan based on the arrest

3    warrant to arrest this defendant?

4        A.    Basically to arrest the defendant we had

5    to execute a search warrant, and we thought it would

6    be more safe, with the weapon seen on his side, to

7    have him in a vehicle and conduct a felony stop

8    after he has left the residence instead of executing

9    the warrant with him inside the residence.

10       Q.    The stop of the vehicle was based on the

11   arrest warrant?

12       A.    That's correct.

13       Q.    Can you describe to the Judge what the

14   plan was to stop the car?

15       A.    A felony stop, to stop the car and have a

16   vehicle in front of his vehicle to be able to slow

17   him down so he wouldn't be able to flee, and at that

18   time box him in, what we call box him in so he was

19   not able to flee in a vehicle, and then at that time

20   to extract him from the vehicle as soon as possible

21   to try to prevent any violence or to get him away

22   from the gun.

23       Q.    Were you present at the time the defendant

47

Michael Calloway - Direct

1    was extracted from his vehicle?

2        A.    No, I was not.

3        Q.    What occurred next with respect to your

4    part of the investigation?

5        A.    I responded to the residence after it

6    was -- after the warrant was executed on his

7    residence, and it was cleared and secure.

8        Q.    Did you participate in the search of his

9    residence?

10       A.    Yes, I did.

11       Q.    Can you briefly just describe to the Judge

12   the items that you found with respect to contraband

13   or weapons?

14       A.    Found numerous guns and a gun safe in the

15   living room.  Three more guns were found in a

16   utility room, shotguns, long guns.  Found several

17   thousand rounds of ammunition, different types --

18   .12 gauge, .20 gauge shotgun shells, rifle

19   ammunition -- and also found a large quantity of

20   methamphetamine inside the safe.

21       Q.    Did you find anything else or did that

22   basically cover it?

23       A.    Inside the safe was also some what they

Michael Calloway - Direct

1   call as colors.  He had a jacket with his name.  His
2   nickname was Hard Head.  He was known as Hard Head.
3   Had his name on it, inside the safe.  Had also a --
4   what they call a walking stick that the Pagans name,
5   the walking stick with Hard Head engraved on it.
6        Q.   Was there any indication of a one percent
7   or anywhere?
8        A.   There was one percent on a lot of items
9   that he had, a picture of the Pagan law with
10  one percent emblem on it.  He had one percent on his
11  colors, his jacket that he wore.  I can't recall
12  exactly how many times one percent, but it was in
13  there quite a bit.
14       Q.   What does that signify, if anything?
15       A.   One percent of all Pagans are felons.  I
16  am not exactly sure.  I am not really familiar with
17  the Pagans.
18       Q.   At the time that the arrest warrant and
19  search warrant were executed, were you aware whether
20  or not the defendant was a convicted felon?
21       A.   Yes, I was.
22       Q.   Do you remember when you confirmed that
23  fact?

Michael Calloway - Direct

1        A.   I confirmed that fact on 5-10 and 5-11
2   through the Kent County AG's Office.  On May 10,
3   2001 and May 11, 2001.
4             MR. O'CONNOR:  If I can have one moment,
5   Your Honor.
6             THE COURT:  All right.
7   BY MR. O'CONNOR:
8        Q.   Did you perform the briefing at the gun
9   range?
10       A.   I believe that may have been Detective
11  Boulerice.
12       Q.   Again that involved the information you
13  were receiving from the field from Detective
14  Layfield and Detective Short regarding the
15  defendant's activities?
16       A.   That's correct.
17            MR. O'CONNOR:  No further questions, Your
18  Honor.
19            Sorry, Your Honor.
20  BY MR. O'CONNOR:
21       Q.   Is this in Kent County, Delaware?
22       A.   Yes.  This occurred in Kent County,
23  Delaware, at 829 Lion Hope Road.

50

Michael Calloway - Direct

1        Q.   Is the person you arrested that day
2   sitting in the courtroom?
3        A.   Yes, Mr. Glanding, setting in the white at
4   the table there.
5             MR. O'CONNOR:  Thank you.  No further
6   questions.
7             MR. SCHMID:  May I have a moment, Your
8   Honor?
9             THE COURT:  Yes.
10            CROSS-EXAMINATION
11  BY MR. SCHMID:
12       Q.   Officer Calloway, what time did you
13  conduct your briefing?
14       A.   Approximately 1700, between 1700 and 1730
15  hours.
16       Q.   That is in layman's terms 5:00 to 5:30?
17       A.   I am sorry.  5:00 p.m., 5:30 p.m.
18       Q.   And that was the time when you advised the
19  officers involved of, as you have described, his
20  background, what was known about him, the fact that
21  he may carry a firearm with him?
22       A.   No.  They were advised prior to going out
23  in the field about that.

51

Michael Calloway - Cross

1        Q.   All right.  Well, speaking of that, you
2   indicated -- no.  Strike that.
3             You wrote a report in this matter;
4   correct?
5        A.   Yes, I did.
6        Q.   In fact, how would you describe your
7   position with respect to this investigation?
8        A.   How would I describe -- I was the
9   investigating officer.
10       Q.   So the chief investigating officer;
11  correct?
12       A.   Yes.
13       Q.   Therefore you have the primary
14  responsibility to oversee the collection of the
15  evidence; correct?
16       A.   The collection of the evidence was -- not
17  the actual collection, but to oversee that.
18       Q.   In other words, if there is a question
19  about that, they would come to you as the chief
20  investigating officer?
21       A.   Myself and Detective Boulerice were both
22  in charge.
23       Q.   Okay.  Detective Boulerice did not write

Michael Calloway - Cross

1  the police report --

2      A.   That's correct.

3      Q.   -- for this case.  You did; correct?

4      A.   That's correct.

5      Q.   Do you recall in your police report your

6  description of the reports that were given to you by

7  Detectives Layfield and Short concerning their

8  observations?

9      A.   I didn't understand that question.  Could

10  you ask it again?

11      Q.   In your police report you deal with the

12  observations that were reported to you by Detectives

13  Short and Layfield from their concealed locations;

14  correct?

15      A.   I am not sure -- I am not sure I

16  understand what you are asking here.

17      Q.   You are in regular radio communication

18  with Detective Layfield?

19      A.   That's correct.

20      Q.   And Detective Short, correct?

21      A.   Okay.  Yes.

22      Q.   And they were transmitting on this

23  frequency, and you had a chance to hear them as they

SHEILA A. DOUGHERTY
Official Court Reporter

---

1  made their observation?

2      A.   That's correct.

3      Q.   And you recorded the observations that you

4  heard in the police report; correct?

5      A.   Yes.

6      Q.   Do you have a copy of the police report

7  with you?

8      A.   Yes, I do.

9      Q.   Would you turn to the investigative

10  narrative, first full page?

11      A.   Okay.

12      Q.   Does it begin at the top, During the week

13  of May 7?

14      A.   The first full sentence was, Set up on

15  defendant's residence.

16          MR. SCHMID:  May I approach the witness,

17  Your Honor?

18          THE COURT:  You may.

19  BY MR. SCHMID:

20      Q.   This is the page.

21      A.   Okay.

22          MR. SCHMID:  It appears as though I may

23  have a different printout, Your Honor.  If I may

SHEILA A. DOUGHERTY
Official Court Reporter

---

54
Michael Calloway - Cross

1  just observe something here.

2          Thank you, Your Honor.

3  BY MR. SCHMID:

4      Q.   With respect to the narrative, okay, the

5  third paragraph in, I believe on your document it

6  would be the top of the second page?

7      A.   Okay.

8      Q.   Which begins on May 11, surveillance was

9  set up, okay?  Would you please go to the last full

10  sentence in that paragraph and read that to

11  yourself?

12      A.   Read it to myself or --

13      Q.   Yes.  Just read it to yourself.

14      A.   Okay.

15      Q.   The officers who were making these

16  observations were Detectives Layfield and Short;

17  correct?

18      A.   That's correct.

19      Q.   And this is a brief summary of what they

20  reported to you?

21      A.   That's correct.

22      Q.   And it refers to the handgun that has been

23  described here?

SHEILA A. DOUGHERTY
Official Court Reporter

---

Michael Calloway - Cross

1      A.   That's correct.

2      Q.   And they describe it as a possible handgun

3  on the right hip; correct?

4      A.   That's correct.

5      Q.   And to the best of your recollection that

6  was the extent of their report to you; correct?

7      A.   That's correct.

8      Q.   And that is why you wrote it in this

9  fashion as opposed to saying they saw a handgun on

10  his hip; correct?

11      A.   That's correct.

12      Q.   If they had said that they had actually

13  saw a handgun, there was no doubt in your mind you

14  would have written they saw a handgun on his hip;

15  correct?

16      A.   Yes, that's correct.

17      Q.   Okay.  Now, when you were getting your

18  search warrant, that search warrant was only for the

19  residence; correct?

20      A.   The residence and any and all vehicles

21  located on the property.

22      Q.   The -- and I understand that.  The vehicle

23  that Mr. Glanding was stopped in was in fact not

Possible Gun
Not for Shoe

Concealment suits
not for Police
Report

SHEILA A. DOUGHERTY
Official Court Reporter

Michael Calloway - Cross

1   stopped on his property; correct?
2       A.    That's correct.
3       Q.    Okay.  You would agree that the vehicle
4   was searched where it was stopped?
5       A.    That's correct.
6       Q.    Okay.  And you would also agree that
7   pursuant to your description of wanting to get him
8   out of the vehicle as soon as possible, that in fact
9   he was pulled from the window of the vehicle;
10  correct?
11      A.    I don't know that.  I was not there to see
12  that.  I did not hear that, no.
13      Q.    Who was present at the stop in order to
14  see that?
15      A.    It would have been the SORT members.  I
16  don't --
17      Q.    Can you name who the chief officer, the
18  highest ranking officer that would have been?
19      A.    Sergeant Kracyla.
20      Q.    Risilla?
21      A.    Kracyla.
22      Q.    Okay.  Now, you would agree, though, that
23  the plan was this described felony stop, and I

Michael Calloway - Cross

1   believe your testimony on direct was that the plan
2   was to get him away from the gun as soon as
3   possible?
4       A.    That's correct.  That would be my -- yeah.
5   When I state that, a felony stop can be done
6   different ways.  I don't know how the SORT Team -- I
7   am not a member of the SORT Team, so I am not
8   trained on how they conduct their felony stops, but
9   yes, was to get him away from the gun for the safety
10  of all.
11          MR. SCHMID:  Your Honor, may I inquire of
12  the State as to their intention to present someone
13  from the SORT Team who was present at the time of
14  the stop.
15          MR. O'CONNOR:  Sergeant Kracyla is in the
16  hallway, Your Honor.
17          MR. SCHMID:  Thank you.
18  BY MR. SCHMID:
19      Q.    When you executed your search warrant, you
20  referred to thousands of rounds of ammunition.
21      A.    That would be an estimate.  I never
22  counted them.
23      Q.    All right.  Large number of them were

58

Michael Calloway - Cross

1   small caliber ammunition for a .22, perhaps?
2       A.    There was quite a few .22 caliber
3   ammunition, yes.
4       Q.    And you have some experience with
5   firearms; correct?
6       A.    Yes.
7       Q.    From your knowledge, it is quite common to
8   have .22 caliber ammunition purchased in quantity of
9   500 and 1,000, in large bricks, as it is called?
10      A.    Yes.
11      Q.    And this is commonly used for plinking;
12  correct?
13      A.    That's correct.
14      Q.    You aware of how many individuals resided
15  at the residence?
16      A.    I believe, I know that there was Mary
17  Mullins, also the defendant, and I believe two small
18  children; but I am not sure because they were not
19  present at the time of the search warrant.
20      Q.    When you say "small," though, you don't
21  know their ages?
22      A.    That's correct.
23      Q.    Could have been young teens for all you

59

Michael Calloway - Cross

1   know?
2       A.    I could not tell you their ages.
3       Q.    I promise not to speak when you are
4   talking if you will let me know.  Sorry.
5          This gun safe was an actual gun safe;
6   correct?
7       A.    Yes, that's correct.
8       Q.    Lockable?
9       A.    Yes.
10      Q.    Was it locked at the time that the search
11  was conducted?
12      A.    I cannot recall.
13      Q.    Okay.  You would agree that the
14  information that was provided to you, which you
15  referred to as past-proven reliable informant, was
16  provided by someone who himself had incurred a
17  charge or charges and was working with you in order
18  to obtain some benefit therefrom?
19      A.    Could you rephrase that question?
20          MR. O'CONNOR:  The question goes to the
21  identity of the informant.
22          MR. SCHMID:  I am not seeking identity,
23  Your Honor, I am seeking -- the assertion is

*(handwritten left margin: DENIED CONFRONTATION I did ASK ANY ATTORNEY?)*

---

Michael Calloway - Cross

1 past-proven reliable. The assertion is certain
2 information was provided. I want to explore that.
3 I will do everything I can to exclude any effort to
4 obtain identity information.
5       THE COURT: Objection is sustained.
6 BY MR. SCHMID:
7     Q. Where were you at the time that the
8 vehicle was stopped?
9     A. I was with other members of the SIU unit,
10 approximately two or three miles out of the area.
11     Q. Okay. You participated in the search of
12 the residence?
13     A. Yes, I did.
14     MR. SCHMID: Nothing further, Your Honor.
15 Thank you.
16       THE COURT: Mr. O'Connor.
17       REDIRECT EXAMINATION
18 BY MR. O'CONNOR:
19     Q. Do you still have your police report there
20 in front of you?
21     A. Yes, I do.
22     Q. Looking at the paragraph Mr. Schmid
23 referred to, did you indicate Corporal Piser's

SHEILA A. DOUGHERTY
Official Court Reporter

---

61

Michael Calloway - Redirect

1 observation of the defendant?
2     A. Excuse me?
3     Q. Did you indicate Corporal Piser advised
4 you his observations of the defendant were that day?
5     A. It said, Corporal Piser advised observed
6 the defendant in the yard with a handgun holstered
7 on his right hip.
8     MR. SCHMID: I am sorry, Your Honor.
9     MR. O'CONNOR: Nothing else, Your Honor.
10     THE COURT: Mr. Schmid.
11     MR. SCHMID: Nothing further, Your Honor.
12     THE COURT: The witness may step down.
13     (The witness stepped down.)
14     MR. O'CONNOR: Your Honor, may I request a
15 five minute recess? Sergeant Kracyla got here at
16 one o'clock and I haven't had a chance to speak to
17 him.
18     THE COURT: All right. Court is in recess
19 for ten minutes.
20     (A brief recess was taken.)
21     THE COURT: Mr. O'Connor.
22     MR. O'CONNOR: Thank you for the recess,
23 Your Honor.

SHEILA A. DOUGHERTY
Official Court Reporter

---

62

Michael Calloway - Redirect

1     The State calls Sergeant Robert Kracyla.
2     * * * * *
3     ROBERT KRACYLA
4     * * * * *
5     called as a witness on the part and behalf
6     of the State, being duly sworn, was
7     examined and testified as follows:
8     DIRECT EXAMINATION
9 BY MR. O'CONNOR:
10     Q. Good afternoon, Sergeant Kracyla.
11     A. Good afternoon.
12     Q. Sergeant Kracyla, how long have you worked
13 for Delaware State Police?
14     A. About 16 years now.
15     Q. You are currently a Sergeant?
16     A. Yes, sir, I am.
17     Q. What is your job? What are your job
18 responsibilities as a Sergeant?
19     A. Right now I am assigned to an FBI task
20 force working with the FBI. I am attached to a
21 violent crime fugitive task force up there. It is a
22 multi-jurisdictional task force investigating
23 violent crime.

SHEILA A. DOUGHERTY
Official Court Reporter

---

63

Robert Kracyla - Direct

1     Prior to that I was the shift manager for
2 four years. I trained at the Academy. Of course I
3 worked the road like every other trooper for about
4 eight years, and prior to that I spent three years
5 with Dover City Police as a patrolman.
6     Q. When you say "up there" are you talking
7 about New Castle County?
8     A. Yes, in Wilmington.
9     Q. What Troop are you affiliated with?
10     A. I am not actually assigned to a troop
11 right now. I am assigned to the drug unit and
12 detached into the FBI office.
13     Q. Is that why you look like that today,
14 because you were doing fugitive work?
15     A. Correct. I just got the call and came
16 right out of Wilmington.
17     Q. Do you also have responsibilities with
18 respect to the SORT Team?
19     A. Yes, I am a team leader with the SORT
20 Team. I have been a member of the SORT Team since
21 1989. I am assistant team leader, I believe it was,
22 in 1996, and I became a team leader around 1998.
23     Q. What are the duties of a team leader?

SHEILA A. DOUGHERTY
Official Court Reporter

1    A.   The team leader is typically do the recon
2  on the site preparation, the recon on the upcoming
3  operations.  We do -- we actually develop the plans,
4  tactical plans that the team will be using for
5  whatever operation.  We also review the search
6  warrant, and pretty much are the liaison between the
7  investigator and the team.  We set up the plans, the
8  tactical plan for the team.
9    Q.   So the police inform you of a subject, and
10  you determine what kind of plan you should use to --
11    A.   To safely --
12    Q.   -- apprehend them?
13    A.   Correct.
14    Q.   With respect to the defendant, Henry
15  Glanding, were you involved in his apprehension?
16    A.   Yes, sir, I was.
17    Q.   Could you describe to the Judge what it is
18  you did, what you knew about the defendant; and what
19  it is you did to determine your plan to apprehend
20  him?
21    A.   Typically when we are developing a
22  tactical plan for an operation involving high risk
23  takeoff or high risk drug entries or anything along

*(handwritten margin, rotated:)* THAT WENT INTO Night Time. HOURS  11:55 PM  11:59 PM

SHEILA A. DOUGHERTY
Official Court Reporter

1  those lines, we kind of use the drug investigators
2  to go ahead and brief us on all the intelligence
3  they have.  They will go ahead and tell us who the
4  target is, what the threat level is perceived, and
5  typically the only time we would be called if it was
6  something that was of a high risk nature.
7    I remember this investigation contacting
8  the drug detectives and then explaining the
9  association with the Pagan motorcycle gang.  Also
10  the criminal history was brought in, the threat of
11  weapons, and it was our determination that once we
12  found out that there was a warrant out of Maryland,
13  which was the reason we were there, to make the
14  arrest, we felt that it would be unsafe for our team
15  to go ahead and make entry into the residence.  We
16  didn't want to make an entry into the residence if
17  we didn't have to, and we did have a daytime search
18  warrant, so we were just basically going to try and
19  wait it out up until 2200 hours ten o'clock at
20  night, until he would come out.  That way we don't
21  put our guys or our team members at unnecessary
22  risk.
23    So what we did was we said we would go

*(handwritten:)* THE POLICE INTENTED TO EVICUTE A NightTime SEARCH.

SHEILA A. DOUGHERTY
Official Court Reporter

---

66
Robert Kracyla - Direct

1  ahead and try and set up surveillance on him while
2  use of the -- our SO's, which are our snipers.  In
3  that area where Mr. Glanding lived, it was extremely
4  rural area.  His trailer kind of sits on a roadway
5  where there is nothing else around.  There is woods
6  probably 300 yards to the front of his residence and
7  probably 2, 300 yards to the rear of his residence,
8  and we know we could get our SO out there with their
9  scopes and field us intelligence as to the suspect's
10  movement.
11    The plan was to go ahead and allow the
12  suspect to leave the residence, thereby we don't put
13  ourselves at unnecessary risk, let him go down the
14  road and conduct what we call a felony car jam,
15  which we have trained that and we also have used in
16  the past.
17    Q.   Prior to conducting the stop, did you have
18  information from the sniper observers about whether
19  the defendant possessed a weapon, at least what they
20  were observing?
21    A.   Yes, sir, we did.  We were out on
22  location.  When I say "on location," the target's
23  house, Mr. Glanding's house, was on Lion Hope Road,

*(handwritten margin, rotated:)* NO CONSTRUCTIVE POSSESSION

SHEILA A. DOUGHERTY
Official Court Reporter

---

67
Robert Kracyla - Direct

1  and we were in a staging area probably a half mile
2  north of his residence.  What the plan was to allow
3  him -- and we had -- the SO, or the snipers, had
4  observed Mr. Glanding go in and out of his residence
5  several times.  They were telling us what he was
6  wearing.  They clearly identified him, and they also
7  identified what they believed was a weapon on his
8  right hip while he was out working in his yard, and
9  I would say that that was about 1500 hours,
10  somewhere in that area, 15, 1600 hours.
11    And we were constantly getting information
12  about the defendant or actually Mr. Glanding coming
13  in and out of the house.  I think he was cleaning
14  his fish for a while.  Constantly we had information
15  as to what his movements were.  He was armed pretty
16  much of the time the SO's had responded back to us.
17    What we wanted to do was go ahead and get
18  him away from the weapon and get him out of his
19  house.  He had come out to work on his car one time,
20  and he had some car problems.  Bottom line was, I
21  guess it was around 2000 hours that he would get
22  into his vehicle, which is a pickup truck, or not a
23  pickup truck, a Ram pickup truck, and start

*(handwritten margin:)* Fact it was 3rd it was gun

SHEILA A. DOUGHERTY
Official Court Reporter

Robert Kracyla - Direct

1    southbound on Lion Hope Road. That is when we

2    started to initiate our stop.

3          MR. O'CONNOR: Your Honor, if I could ask

4    Sergeant Kracyla to use the board and just briefly

5    draw what the plan was so Your Honor understands.

6          THE COURT: You may. Turn it this way

7    while you are drawing it.

8          (The witness stepped down.)

9          THE WITNESS: This was the --

10    Mr. Glanding's. This is Lion Hope Road.

11    Mr. Glanding had a trailer down here. Driveway. We

12    were actually stationed or staged in an area right

13    here, and there was also another vehicle with us.

14    When I say this was the van, our take-down van, and

15    this was a truck, being a pickup truck.

16          Detective Wright was stationed in an area

17    down here in an undercover vehicle. What the plan

18    was, to allow Mr. Glanding to come out of his house

19    in his truck and start southbound on Lion Hope Road.

20    When he got to the area of State Route 300, what we

21    wanted to do was just go ahead, let him go ahead and

22    turn southbound. The truck would start out next.

23    What the intent was, to go ahead and have Detective

SHEILA A. DOUGHERTY
Official Court Reporter

---

Robert Kracyla - Direct

1    Wright go back down the roadway, and he was to go

2    ahead and get on the roadway and start slowing down

3    Mr. Glanding, so he was kind of like just get in

4    front of him and slow him down.

5          Mr. Glanding comes up, starts to catch up

6    to Detective Wright, and now the truck is going to

7    be right behind that vehicle. Now, the van is

8    behind that vehicle. This is the van, and this is

9    the truck. As they start to approach the

10    intersection of State Route 300, Detective Wright

11    stops his vehicle like he would at a stop sign.

12    Mr. Glanding is showing down. As he is slowing to a

13    stop, what we typically do is we set up a vehicle

14    jam so there is a -- to decrease any type of chance

15    of a pursuit developing. It jams the vehicles in.

16          Detective Kreisman was operating the

17    truck, comes up and taps Mr. Glanding's vehicle in

18    the rear. Detective Wright is to go ahead and place

19    his vehicle in reverse and go ahead and jam that

20    vehicle in a situation where he can't move forward

21    or backwards. At the same time the van will move up

22    right here and actually stop, right alongside the

23    driver's door, and then the team deploys from the

SHEILA A. DOUGHERTY
Official Court Reporter

---

Robert Kracyla - Direct

1    side doors of the van.

2          What we immediately deploy when we go

3    into the actual deployment, what happens now,

4    this is exactly what happened. Detective

5    Wright comes out, stops his vehicle. Detective

6    Kreisman comes up and taps him in the rear.

7    Now, Detective Wright didn't have a chance to

8    go ahead and put his vehicle in reverse to jam

9    him inside. Once that vehicle was stopped in

10    his rear, Mr. Glanding -- and like I say, I

11    observed this because what happens now is the

12    door opens up on the van, from our van, and the

13    first person out of the van is a Detective

14    Perna, and he has a shield, and I immediately

15    follow Detective Perna with a sub machine gun

16    to go ahead and cover the occupants in the

17    vehicle. I say, Cover them to make sure they

18    don't make any movement that may be threatening

19    toward the team. The shield is to protect the

20    team. That is why it is the first person out

21    of the van.

22          The shield comes out, but as the

23    shield is coming out of the door and I see it

SHEILA A. DOUGHERTY
Official Court Reporter

---

Robert Kracyla - Direct

1    as the door is coming open, I seen Mr. Glanding

2    start to go -- come out of his truck. He

3    opened up the door, and started to take maybe

4    one step out of the truck door. It was my

5    impression he was going to be confronting the

6    person that struck him in the rear. He sees

7    the van. Detective Perna says to him, "State

8    Police." And he starts to go back into the

9    van, back into his truck, and Detective Perna

10    strikes the shield against the driver's door or

11    actually the driver's window, but the window

12    was down, of the truck, so he comes up and he

13    plants the shield on the driver's window of the

14    truck.

15          I come forward and cover into the

16    van, into the truck, with a sub machine gun. I

17    immediately tell him I want to see his hands, I

18    want to see his hands.

19          Now, if I can just refer to my notes

20    for one second, I want to get the placement of

21    the team members. So you have myself here,

22    Detective Perna here, would be number two, and

23    three, and seven, which is a cover person,

SHEILA A. DOUGHERTY
Official Court Reporter

72
Robert Kracyla - Direct

1  which is Lieutenant Ogden, and seven is
2  Corporal Kleckner. Also another support
3  person, number four, which is Corporal Boyce.
4  They are all lined up pretty much on this side
5  of the car, and we have two additional people
6  on this side of the car to cover if there
7  should be someone on the passenger side of the
8  vehicle, where someone attempted to escape from
9  this side, they go around and cover the
10 passenger side of the vehicle.
11 BY MR. O'CONNOR:
12    Q.  Was anybody else in the vehicle?
13    A.  There was not anyone else in the vehicle
14 from our initial observation, where we initially
15 stopped it.
16    Q.  Once the door was closed on the vehicle,
17 how was the defendant extracted from the door?
18    A.  I yelled to the defendant, I wanted to see
19 his hands. How this all happens I can't walk you
20 through it exactly, but someone secures his hands.
21 They reach through the window and secure his hands
22 and actually pulled through the window, through the
23 driver's window, and I believe that would have been

SHEILA A. DOUGHERTY
Official Court Reporter

73
Robert Kracyla - Direct

1  one of the three support people, which were either
2  Perna, Kleckner, or --
3     Q.  Boyce?
4     A.  Or Boyce. They extract him from the
5  vehicle. He is placed on the ground and he is
6  handcuffed and searched.
7        At that time I move from my position to go
8  around to the passenger side of the pickup truck. I
9  open up the door to make sure there aren't any
10 additional people laying on the front or passenger
11 side of the pickup. I know that Mr. Glanding does
12 not have the gun that they observed on his hip while
13 he is on the ground now. I go to the console and
14 flip open the console, and when I flip open the
15 console I notice a, what appears to be a revolver in
16 a black leather holster. Also next to the revolver
17 is a blue satin-like tie bag next to it. I opened
18 up the satin tie bag and saw that there was three
19 plastic pill bottles, which I spilled on the front
20 seat driver's seat of the van, and --
21    Q.  Did you disturb the pill bottles after
22 that?
23    A.  No. I stopped them right where they were,

SHEILA A. DOUGHERTY
Official Court Reporter

74
Robert Kracyla - Direct

1  just opened up the blue belted bag, dumped the
2  contents on the passenger seat, and left it there
3  for the investigators.
4     Q.  At this point you knew the defendant was
5  wanted out of the State of Maryland?
6     A.  Yes. I knew it the entire time while I
7  was driving down the road and when I exited his
8  house until the time he was taken into custody.
9        MR. O'CONNOR: Your Honor, may I have two
10 pictures marked for identification purposes?
11       THE COURT: You may.
12       (The witness resumed the witness stand.)
13       THE CLERK: They have been marked as State
14 for Identification C and D.
15       (State's Exhibit C and D marked for
16 identification.)
17       MR. O'CONNOR: May I approach the witness?
18       THE COURT: You may.
19 BY MR. O'CONNOR:
20    Q.  I am going to hand you what is marked
21 State's for Identification C. Do you recognize
22 that?
23    A.  Yes. That is the weapon I observed in the

SHEILA A. DOUGHERTY
Official Court Reporter

75
Robert Kracyla - Direct

1  console section of the truck.
2     Q.  Subsequent to you opening up the console
3  that evening?
4     A.  That's correct.
5     Q.  I am going to hand you what has been
6  marked as State's for Identification D. Do you
7  recognize that picture?
8     A.  Yes. That's the satin bag that was right
9  next to the weapon in the console that I opened up
10 and spilled the contents on the front seat.
11    Q.  The Crown Royal bag?
12    A.  That's correct.
13       MR. O'CONNOR: Your Honor, the State moves
14 State's for Identification C and D as the next
15 State's Exhibits.
16       THE COURT: Any objection?
17       MR. SCHMID: None for purposes of this
18 hearing, Your Honor.
19       THE COURT: Mark the items as State's
20 Exhibits.
21       THE CLERK: They have been marked as
22 State's Exhibits 4 and 5.
23

SHEILA A. DOUGHERTY
Official Court Reporter

1          (State's Exhibit 4 and 5 received into
2    evidence.)
3    BY MR. O'CONNOR:
4         Q.   Sergeant Kracyla, did you follow standard
5    operating procedure in effectuating this felony stop
6    on this vehicle?
7         A.   Yes, sir.  This is a felony stop that we
8    conduct as a normal course of business as a tactical
9    team or SORT Team.  We train 246 hours a year during
10   that training period.  Felony car stops are normally
11   part of our training period.  Normal training
12   routine.
13        Q.   With respect to the ramming of the vehicle
14   from the pickup truck into the defendant's vehicle,
15   is that at a high rate of speed?
16        A.   No.  That would probably be at five miles
17   an hour or less.
18        MR. O'CONNOR:  Your Honor, if I could have
19   one other item marked for identification purposes.
20        THE COURT:  You may.
21        THE CLERK:  It has been marked as State's
22   for Identification E.
23

1          (State's Exhibit E marked for
2    identification.)
3    BY MR. O'CONNOR:
4         Q.   I am going to hand you what has been
5    marked as State's for Identification E.  Do you
6    recognize that?
7         A.   Yes.  That would be his vehicle.  It is
8    the Dodge Ram.
9         Q.   Do you see any outward damage to the rear
10   of the vehicle from this tap performed by the State
11   Police?
12        A.   No, I don't see any damage.
13        Q.   Anything significant at all?
14        A.   No.
15        MR. O'CONNOR:  State would move this as
16   the next State's Exhibit.
17        THE COURT:  Mr. Schmid.
18        MR. SCHMID:  Nothing, Your Honor.
19        THE COURT:  Mark it as the next State's
20   Exhibit.
21        THE CLERK:  Marked as State's Exhibit 6.
22        (State's Exhibit 6 received into
23   evidence.)

1    BY MR. O'CONNOR:
2         Q.   Sergeant Kracyla, subsequent to the arrest
3    of the defendant at the site of the traffic stop,
4    did you then participate in execution of a search
5    warrant at the residence?
6         A.   Yes, sir, I did.
7         Q.   Can you describe to the Judge what you did
8    at that location?
9         A.   That location, we were fairly confident
10   that there was no one inside.  However, any time
11   executing a warrant we can never take anything for
12   granted.  We made entry into the residence and
13   cleared the residence.  Basically our job is just to
14   clear the residence for any bodies inside, at which
15   time we made entry, cleared the residence based on
16   the search warrant, and there was no one inside when
17   we cleared the residence.
18        Q.   Did you announce you were executing the
19   search warrant?
20        A.   Yes.  That is standard operating procedure
21   making an announcement at the door.
22        Q.   Did you find anybody else inside?
23        A.   No.

1         Q.   Once the residence was cleared, means that
2    there was no one else inside.  What did your team
3    do?
4         A.   As we always do, we turned the
5    investigation over to the drug unit guys, who are
6    the investigators, and they are the ones that take
7    care of the actual search.
8         Q.   You subsequently follow that up with a
9    debriefing?
10        A.   We always debrief the operation and we
11   fill out our -- an after action report, which is
12   kind of a debriefing report.
13        Q.   Was that done in this case?
14        A.   Yes.
15        MR. O'CONNOR:  If I could have one second,
16   Your Honor.
17        THE COURT:  All right.
18        MR. O'CONNOR:  No further questions at
19   this time.
20        THE COURT:  You may cross-examine.
21             CROSS-EXAMINATION
22   BY MR. SCHMID:
23        Q.   Sergeant Kracyla, you referred to a

1  debriefing report?

2      A.   After action report.

3      Q.   Is that after action report which you

4  referred to at some point during your testimony and

5  direct examination?

6      A.   Yes.

7      MR. SCHMID:   Your Honor, I do not have a

8  copy of that debriefing report, would like to be

9  provided with a copy and at least a brief

10  opportunity to review it.

11      THE COURT:   All right.

12      MR. O'CONNOR:   It has been done, Your

13  Honor.

14      MR. SCHMID:   I now have that in my hand.

15  I would like to have some time to look it over, if I

16  may.

17      THE COURT:   How long is it?

18      MR. SCHMID:   Two pages long, handwritten.

19  Could I have at least five minutes?

20      THE COURT:   The Court will stand in recess

21  for ten minutes.

22      (A brief recess was taken.)

23      THE COURT:   Mr. Schmid.

---

1      MR. SCHMID:   Thank you, Your Honor.

2  BY MR. SCHMID:

3      Q.   Officer Kracyla, you would agree that you

4  strive for speed in these stops, correct?  And I

5  don't mean speed when you are coming up on the

6  vehicle so much as how this stop unfolds, you want

7  to do it as quickly as possible; correct?

8      A.   We attempt to overwhelm the operator,

9  correct.  Kind of speed is our friend when it comes

10  to movement, and I am not talking about vehicle

11  movement.  It is movement of the team to assigned

12  areas.

13      Q.   So in fact the trailing van that has the

14  stop team in it is already moving forward before the

15  vehicle is fully stopped, correct?  Once the target

16  vehicle has been boxed front and back, the van is

17  already pulling up beside it?

18      A.   That's correct.

19      Q.   Even before it is fully stopped?

20      A.   Normally we like to get that vehicle

21  secured, and that is what the jam vehicle's purpose

22  is, to go ahead and secure the vehicle, and then we

23  go ahead and make our movement to deploy.

---

82

1      Q.   And then you are not necessarily waiting

2  until the van has come to a complete stop before the

3  door is open and people be deploying; correct?

4      A.   We should, and we don't want to be running

5  out of a moving van, but it is either stopped or

6  very, very close to being stopped.

7      Q.   Okay.  Nonetheless, the hallmark is haste?

8      A.   Not haste.

9      Q.   Quickness?

10      A.   Quickness.

11      Q.   Very good.  Now, it was just a very quick

12  moment from the time that the door opened until in

13  fact Mr. Glanding was sticking his hands out the

14  window and his hands were being secured; correct?

15      A.   That's correct.

16      Q.   Okay.  And it was within an instant, I

17  will describe it, from the time that his hands were

18  secured until he was out of the truck and on the

19  ground; correct?

20      A.   Very quickly.

21      Q.   Okay.  There was no opportunity for any

22  significant activity inside the truck by

23  Mr. Glanding; correct?

*Her .eyes stare at there .was a shield .window* (handwritten margin note)

---

83

1      A.   The opportunity would have come when he

2  first noticed the doors opening in the van and he

3  started to retreat back into the -- back into his

4  vehicle, but he never got the opportunity.

5      Q.   But in fact the entire time you see his

6  face because he is backing up into the truck and the

7  door is still open, when the shield hits the door;

8  correct?

9      A.   Well, when you say "open" or when I said

10  "open," the door wasn't opened that I could see into

11  the vehicle.  The door was opened.

12      Q.   Wasn't fully opened?

13      A.   Maybe a foot perhaps, but I could not see

14  from his waist -- correction -- from his waist up --

15  correction -- waist down.

16      Q.   But he was still looking at the activities

17  that were occurring on the driver's side of the

18  truck the entire time; correct?

19      A.   It was my assumption that he was basically

20  investigating what was going on behind him when he

21  exited his vehicle.

22      Q.   What I am saying is that at the time this

23  door is being pushed closed by the shield --

1    A.   Correct.

2    Q.   -- and while everyone else is deploying

3  you with this either sub machine gun or shotgun, the

4  weapon in your hands and the others, Mr. Glanding is

5  looking at you, and looking at the man with the

6  shield, and looking at everyone else jumping out of

7  the van; correct?

8    A.   I don't know what he was looking at.

9    Q.   Okay.  When he was searched, he was found

10  to have in his possession a large black leather

11  wallet; correct?

12    A.   I can't say for sure.

13    Q.   Okay.  Did you notice that he had

14  something on his belt?

15    A.   I didn't notice, no, I didn't.

16    Q.   A knife or something else in a sheath or

17  pouch?

18    A.   I didn't notice.  However, I later found

19  that he did have a knife in his possession.

20    Q.   Okay.  Did he also have a Leatherman or

21  other similar device in a leather pouch?

22    A.   I don't recall, sir.

23    Q.   Okay.  When he was out of the vehicle, he

1  was pulled out through the open window, there was no

2  opportunity for him to get back up off of the

3  ground, was there?

4    A.   That's correct.

5    Q.   You had him down with overwhelming force,

6  as you describe it; correct?

7    A.   I didn't describe it as overwhelming

8  force.

9    Q.   Did you say that you tried to overwhelm

10  the individual that you are trying to stop?

11    A.   With speed and quick movement.

12    Q.   Yes?

13    A.   Correct.

14    Q.   He was on the ground, there was more than

15  one person there, restraining him; correct?

16    A.   Just the force necessary to make the

17  arrest.

18    Q.   Okay.  I am trying to help to flesh out

19  his possible opportunity to get up.  There was none;

20  correct?

21    A.   No, there was no opportunity to escape.

22    Q.   Okay.  And therefore he was -- when you

23  began your search, was he still on the ground or had

1  he already been moved to one of the vehicles?

2    A.   We as standard operating procedure, we as

3  the tactical team conduct a pat down search of all

4  our defendants and pretty much turn all the

5  evidentiary work over to the investigators.  We are

6  typically patting down for weapons.

7       I was not involved in the search directly.

8  And I am sure that the people in the -- that

9  actually took him into custody were the ones that

10  actually patted him down.

11    Q.   You had no fear that he was going to be

12  able to retrieve anything out of that truck to use

13  it against you once he was in custody?

14    A.   Once he was in custody, I was sure that he

15  couldn't get back into the truck.

16    Q.   Um-hum.  Okay.  And again, just to make

17  sure that I understand, you got him out of that

18  truck very quickly, in a matter of seconds, didn't

19  you?

20    A.   Specifically me, no, but the team did.

21    Q.   The team you are the face for, the team

22  you are the team leader; correct?

23    A.   Correct.

1    Q.   You and your team got him out within a

2  matter of seconds?

3    A.   That is correct.

4    Q.   Okay.  And in fact, at the time of the

5  stop he was -- the door opened one foot out, partway

6  out of the vehicle, and you forced him back in and

7  then pulled him back out through -- you and your

8  team forced him back into the truck and pulled him

9  out through the window?

10    A.   That's correct.

11    Q.   Okay.  All of your activities at the scene

12  involved the stop and arrest slash detention of

13  Mr. Glanding; correct?

14    A.   And also the executing of the search

15  warrant back at the residence.

16    Q.   First of all, with respect to the vehicle

17  out at 300 and --

18    A.   Lion Hope.

19    Q.   Lion Hope Road; correct?

20    A.   Our involvement was the planning and the

21  actual execution of that plan.  And when it is

22  according to plan, other than Detective Wright did

23  not get an opportunity to go ahead and jam from the

Robert Kracyla - Cross

1  front.
2      Q.   You did not have any direction to conduct
3  a thorough search or an inventory search of the
4  vehicle; correct?
5      A.   Were we directed upon?
6      Q.   Correct.
7      A.   No, but we always clear the vehicle for
8  other occupants.
9      Q.   Well, once the vehicle was cleared of
10 other occupants, you had no specifically assigned
11 duties to conduct an inventory or other search of
12 the vehicle for evidence; correct?
13     A.   That is not part of my duties to go do an
14 inventory search.
15     Q.   Okay.
16         MR. SCHMID:  Nothing further, Your Honor.
17         THE COURT:  Mr. O'Connor.
18             REDIRECT EXAMINATION
19 BY MR. O'CONNOR:
20     Q.   Did you understand the car was going to be
21 towed?
22     A.   Yes.
23     Q.   Did you know whether or not the defendant

SHEILA A. DOUGHERTY
Official Court Reporter

*(handwritten margin: back, Couli'd search vehicle me They did not force me into my truck so they have probable cause the police forced)*

Robert Kracyla - Redirect

1  had a gun in that vehicle?
2      A.   I did not know at the time, no, sir.
3      Q.   Did you have information that would lead
4  you to have concerns that he did?
5      A.   Yes, because the SO's had told us that he
6  had a weapon on his person when he was outside of
7  the house maybe an hour prior to him leaving.
8      Q.   Mr. Schmid asked you -- made a statement
9  that you forced the defendant back into his truck;
10 correct?
11     A.   That's correct.
12     Q.   And you didn't shove his legs back up in
13 the -- correct?
14     A.   No.  I believe the -- when I say "forced,"
15 he may have retreated back, kind of retreated back
16 into the truck himself because he saw the movement
17 coming toward him.  And the shield may have pushed
18 the door closed, I am not real sure, but he wasn't
19 actually pushed into the vehicle.
20     Q.   His choices were limited at that point?
21     A.   He really had no choice.
22         MR. O'CONNOR:  No other questions.
23         THE COURT:  Mr. Schmid.

SHEILA A. DOUGHERTY
Official Court Reporter

90
Robert Kracyla - Redirect

1          MR. SCHMID:  Nothing further, Your Honor.
2               RECROSS-EXAMINATION
3  BY THE COURT:
4      Q.   You said earlier that his hands were
5  secured when he was in the vehicle before he was
6  extracted?
7      A.   That's correct.
8      Q.   How were his hands secured?
9      A.   I just remember one of the team members,
10 and I don't recall who it was, grabbed his hands so
11 he wouldn't have an opportunity to go ahead and go
12 for a weapon if it was either on his hip or
13 somewhere else in the vehicle.  I remember them,
14 someone, going up there and securing his hands as he
15 was -- had his hands up, and they grabbed his hands.
16     Q.   This was when he was in the vehicle?
17     A.   This is when he was in the vehicle.  The
18 shield was placed against the driver's window, I was
19 covering his hands, I was watching his hands
20 specifically, and I saw someone grab his hands to go
21 ahead and take control of his hands.
22     Q.   To get him out the door rather than
23 through the window, that person would have had to

SHEILA A. DOUGHERTY
Official Court Reporter

*(handwritten margin: being Robbed was I Thought I No)*

Robert Kracyla - Recross   91

1  let go of his hands?
2      A.   Your Honor, I am not sure which person
3  actually secured his hands so I don't know what
4  their positions was and who actually placed their
5  hands on his hands to remove him from the vehicle.
6      Q.   Well, the officer was outside the vehicle;
7  correct?
8      A.   Yes.
9      Q.   The door was closed?
10     A.   The door was closed.
11     Q.   He is holding his hands to get him out of
12 the window, he comes through the window and grabs
13 his hands?
14     A.   That's correct.
15         THE COURT:  Any other questions in view of
16 the Court's inquiry?
17         MR. O'CONNOR:  None from the State.
18             RECROSS-EXAMINATION
19 BY MR. SCHMID:
20     Q.   Was Mr. Glanding invited to voluntarily
21 exit the vehicle?
22     A.   It happened so quickly, he was removed
23 within seconds.

SHEILA A. DOUGHERTY
Official Court Reporter

93

1    Q.    So there was no opportunity for anyone
2    there at the scene to make that invitation because
3    he was just pulled out that quickly?
4         A.    Correct.
5         Q.    Which is consistent with how the rest of
6    the stop unfolded, just that quickly; correct?
7         A.    I would say from the time the team
8    deployed from our van to the time he was secured and
9    handcuffed on the ground was five seconds.
10              MR. SCHMID: Thank you.
11              Nothing further, Your Honor.
12              THE COURT: Mr. O'Connor.
13              MR. O'CONNOR: Nothing further, Your
14   Honor.
15              THE COURT: You may step down.
16              (The witness stepped down.)
17              THE COURT: Mr. O'Connor.
18              MR. O'CONNOR: Your Honor, if I can just
19   review my notes from the ground for the motion.
20              THE COURT: You may.
21              MR. O'CONNOR: Your Honor, I don't believe
22   the State is going to offer any more evidence at
23   this time.

SHEILA A. DOUGHERTY
Official Court Reporter

1               THE COURT: Mr. Schmid.
2               MR. SCHMID: If I may have a moment, Your
3    Honor.
4               THE COURT: You may.
5               MR. SCHMID: Nothing from the defense,
6    Your Honor.
7               THE COURT: All right. I will hear your
8    arguments. Mr. Schmid.
9               MR. SCHMID: Well, Your Honor, although
10   there is a -- first of all, it is clear with respect
11   to the vehicle stop and search that there was no
12   search warrant. And the only asserted basis for the
13   stop was an arrest warrant for the Maryland arrest,
14   and therefore this stop and any search would be a
15   search incident to an arrest.
16              The case law -- now, there was, as he
17   suggests, that the search warrant also covered any
18   vehicles found at the scene, but obviously there is
19   also evidence this vehicle was not stopped at the
20   scene, this vehicle was not searched at the scene.
21   I would assert that this vehicle is not a part of
22   that search warrant, and that any search warrant
23   that issued would not include that vehicle.

SHEILA A. DOUGHERTY
Official Court Reporter

94

1         There is abundant evidence to suggest how
2    quickly this stop and seizure of Mr. Glanding
3    occurred. Five seconds, remarkably short period of
4    time. We assert that Mr. Glanding was out of the
5    vehicle before there was any opportunity to either
6    grab a weapon or destroy evidence.
7         Under the Delaware case law, the only two
8    bases would be to assure that evidence would not be
9    destroyed or for officer safety, that no weapon
10   could be grabbed. Essentially the wing span rule.
11   The wing span that would be measured for
12   Mr. Glanding in this instance would be his wing span
13   while on the ground outside the vehicle, and
14   therefore any search conducted there in the vehicle
15   was unnecessary and not supported by the case law.
16        We assert under the circumstances then
17   that the discovery of that weapon under those
18   circumstances is not supported by the case law and
19   would not therefore be an item that is available to
20   the State for proper evidence and should be
21   suppressed along with the drugs.
22        With respect to -- I had also expressed
23   some concern with the timing on the search warrant.

SHEILA A. DOUGHERTY
Official Court Reporter

95

1    I will state that I acknowledge that according to
2    the evidence presented here during this hearing that
3    the officers had in their possession a search
4    warrant presented through the proper means to the
5    Superior Court, and that a signature does appear to
6    have been obtained prior to the time of the search
7    of the residence.
8               THE COURT: All right. So the validity of
9    the warrant itself is not challenged?
10              MR. SCHMID: No, it is not, Your Honor.
11              THE COURT: Did the warrant establish
12   probable cause to search the vehicle that was
13   located on the premises?
14              MR. SCHMID: The reason I am asking that
15   is if the vehicle is observed on the premises and
16   then it is observed leaving the premises, as
17   officers are about to execute a search warrant, the
18   probable cause --
19              THE COURT: Did the authority under the
20   warrant evaporate when the vehicle was taken from
21   the premises? Is that what you are saying?
22              MR. SCHMID: What I am going to suggest is
23   just that, Your Honor. I am going to assert that

SHEILA A. DOUGHERTY
Official Court Reporter

Case 1:07-cv-00469-GMS    Document 24    Filed 01/02/2008    Page 43 of 64

96

97

1 under the circumstances if the vehicle leaves the
2 premises it is no longer described within the search
3 warrant as being all vehicles on the premises.
4     THE COURT: Was it a vehicle on the
5 premises at the time the warrant was authorized?
6     MR. SCHMID: Actually I don't know, Your
7 Honor. There is no evidence to state one way or the
8 other.
9     THE COURT: Can that be inferred from the
10 evidence?
11     MR. SCHMID: Your Honor, I don't think
12 that I am in a position to concede that, but I don't
13 know that it can be inferred from the evidence. I
14 would not so infer.
15     THE COURT: All right. Assuming that it
16 may be inferred, do you have case law for the
17 proposition that the defendant moving the vehicle
18 eliminates the authority to search it?
19     MR. SCHMID: I do not presently have such
20 case law, Your Honor. It was not something that I
21 recognized the need to address at the time of my
22 preparation, and I am not at this moment prepared to
23 address that issue.

No CASE LAW'S

SHEILA A. DOUGHERTY
Official Court Reporter

1     THE COURT: All right. So just so I
2 understand what your position is now based on the
3 evidence, you are seeking to suppress the items
4 seized from the vehicle, the weapon and the drugs
5 seized from the vehicle. That is the extent of your
6 motion; is that correct?
7     MR. SCHMID: Yes, Your Honor.
8     THE COURT: Mr. O'Connor.
9     MR. O'CONNOR: Your Honor, to the extent
10 that the Court was just asking Mr. Schmid questions
11 about whether the authority for probable cause
12 evaporates when the vehicle leaves the residence, I
13 don't have an answer for that. I would argue that
14 it does not.
15     I think that the search warrant itself
16 does provide sufficient probable cause for a search
17 of the vehicle in that it does refer to the fact
18 that the defendant travels in vehicles to other
19 locations in Maryland to engage in drug activity,
20 which was part of the basis for the search warrant.
21     I don't have any specific case law on
22 that, Your Honor. And I think another factor in
23 that analysis, as Sergeant Kracyla testified, the

SHEILA A. DOUGHERTY
Official Court Reporter

98

1 police basically waited for the defendant to leave
2 the residence because of their safety concerns with
3 him and the firearm. I believe there has been
4 testimony that it would have been more dangerous for
5 them to go in his house while he was in there
6 because they would not have as much control. To
7 that extent, the State would assert that there was
8 sufficient probable cause to search the vehicle
9 pursuant to the warrant.
10     Assuming that that is legally incorrect,
11 Your Honor, I think that the paramount concern in
12 this take-down of the defendant was officer safety.
13 The officers all testified they were aware of his
14 violent record, they are aware that he is a drug
15 dealer, a member of a Pagan motorcycle gang, that
16 that day he was seen with a revolver, a firearm on
17 his side, doing yard work. And while they didn't
18 see him bring the gun into the vehicle, they had
19 prior intelligence that says that he always travels
20 with a gun, and that if he was ever stopped by the
21 police he would shoot to kill a police officer.
22     I think that those concerns, legitimate
23 concerns for officer safety are paramount in this

SHEILA A. DOUGHERTY
Official Court Reporter

THAY HAVE TO have
PROBABLE CAUSE

99



1 case when he was taken off.
2     When the -- there are several exceptions
3 to the warrant requirement with respect to this
4 case. The first is automobile exception. There is
5 nothing about the automobile exception that says
6 that the defendant has to be remained in the vehicle
7 for the cops to be able to search it pursuant to the
8 automobile exception. In fact, although I don't
9 have the case, I read a case last week which I could
10 likely locate quickly where Judge Slights ruled that
11 a search of a vehicle subsequent to the arrest of
12 the driver fit within the automobile exception
13 pursuant to Belton, so I think that's a valid
14 exception.     Should Know
15     THE COURT: Pursuant to what?
16     MR. O'CONNOR: Belton v. New York.
17 Additionally, Your Honor, a SIVA search in this
18 case -- search incident to valid arrest -- I believe
19 applies. The location of the compartment where the
20 gun was located was certainly within the defendant's
21 wing span. Now, it is fairly clear that once the
22 police got ahold of the defendant it appeared he had
23 nowhere to go. But I think that that, the location

SHEILA A. DOUGHERTY
Official Court Reporter

41

1  of that gun was certainly within his wing span, and
2  even though he is removed from the car the police
3  are entitled to search that area of the vehicle.
4      Thirdly, the car was going to be towed.
5  The defendant was the only driver of the vehicle,
6  and it was intended that he would be arrested at the
7  time; so the police, whether it is considered an
8  inventory search at that time or whether an
9  inventory search would have been performed by
10 another member of the state police, Detective
11 Weaver, who was the evidence technician, inevitably
12 the police would have discovered the gun pursuant to
13 inventory search.
14      If the Court has some discomfort with the
15 fact that Sergeant Kracyla testified that he is not
16 there to search the car but he is there to clear the
17 car, but the gun would have been found anyway
18 pursuant to an inventory search, and you know,
19 pursuant to all of these exceptions to the warrant
20 requirement, and considering the potential perceived
21 dangerousness of this defendant, based on not only
22 his history but what the police observed that day,
23 and the statements that were relied on in the

*(handwritten margin notes: "Stads of A needed warrant" and "No violent History on my record, Police told Judge there was to get warrant")*

SHEILA A. DOUGHERTY
Official Court Reporter

---

1  probable cause for the search warrant, which
2  Sergeant Kracyla stated that they did review prior
3  to formulating a plan, I think the police actions
4  were certainly appropriate and that the seized --
5  search and seizure of the contraband in the vehicle
6  was proper.
7      THE COURT: Mr. Schmid.
8      MR. SCHMID: Just a couple of
9  observations, Your Honor.
10     First of all, there isn't any indication
11 on Mr. Glanding's criminal history of violent
12 conduct that can be pointed to. That is not the
13 bases. This is rather conduct that an warrant.
14 warrant was issued for at 11:30 that morning, which
15 is, as near as I can determine, the only violent
16 conduct on Mr. Glanding's record.
17     With respect to the search again, I assert
18 that that is on the basis of, as was described by
19 the SORT officer, officer safety, and to protect and
20 prevent any evidence from being destroyed, and again
21 I assert that with the quickness of the search or
22 rather the stop and the seizure, the fact that at
23 all times his hands were in view by the officers,

SHEILA A. DOUGHERTY
Official Court Reporter

---

102

1  there was no opportunity for anything to be
2  destroyed, otherwise secreted, and that in fact
3  therefore there was not within the vehicle a valid
4  basis for the search.
5      And if the Court wishes, I will undertake
6  to do research in order to try to find an answer to
7  the Court's question with respect to any case law on
8  the issue of a vehicle leaving the scene.
9      THE COURT: Mr. Clerk, hand me the
10 exhibits, please.
11     (Complied.)
12     THE COURT: Counsel, I am going to rule on
13 the motion after the recess. The Court is in recess
14 until 4:00 p.m.
15     (A brief recess was taken.)
16           * * * * *
17                    4:00 p.m.
                     Courtroom No. 2
18                   The same day.
19 PRESENT: As noted.
20           * * * * *
21     THE COURT: Mr. Clerk, here are the
22 exhibits returned to you.
23     Counsel, I have given careful

SHEILA A. DOUGHERTY
Official Court Reporter

---

103

1  consideration to the arguments and all the evidence
2  which has been presented at this hearing, including
3  the exhibits which have been introduced in the
4  course of the hearing. That issue is the lawfulness
5  of the search and seizure of the defendant's vehicle
6  upon his arrest.
7      I am satisfied from the evidence which has
8  been presented that the Delaware State Police had
9  the authority to stop and arrest the defendant
10 pursuant to the Maryland warrant which was
11 outstanding. I am also satisfied there was probable
12 cause to arrest the defendant not only based upon
13 the Maryland warrant, but also the direct
14 observations of the Delaware State Police of the
15 defendant which provided reasonable grounds to
16 believe that he possessed a firearm as a prohibited
17 person at the time of his arrest.
18     The search of the passenger compartment
19 area of the vehicle was contemporaneous with the
20 arrest of the defendant. That search is clearly
21 authorized under New York versus Belton, 453 U.S.
22 454, decided by the United States Supreme Court in
23 1981. Therefore, the search was lawful and the

SHEILA A. DOUGHERTY
Official Court Reporter

1  evidence will not be suppressed for that reason.

2        Additionally, the vehicle itself was the

3  subject of a valid search warrant issued a few hours

4  earlier by Resident Judge Vaughn. While the removal

5  of the vehicle from the premises delayed the search,

6  it was inevitable that the vehicle would be searched

7  upon the defendant's arrest either pursuant to the

8  warrant itself or for purposes of an inventory of

9  the contents of the vehicle. Because the items

10  found in the vehicle would have inevitably been

11  discovered, this also provides a basis for the

12  motion to suppress to be denied.

13        For all these reasons, the defendant's

14  motion to suppress is denied.

15        Is there anything else prior to the trial

16  tomorrow that I need to address? Well, first,

17  Mr. Schmid, have I addressed all the arguments that

18  you have raised?

19        MR. SCHMID: Yes. Thank you, Your Honor.

20        THE COURT: All right. Is there anything

21  else to be addressed before tomorrow?

22        MR. SCHMID: Your Honor, Mr. O'Connor has

23  indicated that he does not intend to present any

1  evidence in the trial regarding Mr. Glanding's

2  alleged ties to the Pagans. Although some

3  references were made here at this hearing,

4  nonetheless for the sake of the record, I do think

5  that it is incumbent upon me to submit a formal

6  written Motion in Limine regarding that issue in

7  order to establish what the parameters will be for

8  any reference that might be made at any point during

9  the trial.

10        THE COURT: A written motion is

11  unnecessary.

12        Mr. O'Connor, do you have any comment?

13        MR. O'CONNOR: Judge, if I intend to

14  elicit anything about the Pagan organization I will

15  seek leave of the Court first. I presently don't

16  have any intention of doing that.

17        I explained to Mr. Schmid that a lot of

18  the defendant's Pagan memorabilia, for lack of

19  better description, was found in a locked safe, but

20  in the safe with the guns, so if he tries to

21  disclaim that the property in the safe was his,

22  that's evidence that directly ties him to the

23  contents of the safe. But presently I don't know

106

1  that I need to go there, so until I think I do, I

2  will ask the court before I do that.

3        THE COURT: All right. I will grant the

4  defense application and order that there is to be no

5  reference to any membership in the Pagan motorcycle

6  club or gang without leave of the Court first

7  obtained out of the jury's presence.

8        Counsel, for the record I want to advise

9  you that after the jury was selected today Juror

10  Number 7, Williemena Heller, advised the bailiff

11  that she had a doctor's appointment tomorrow, and

12  she has apparently prior to selection today already

13  been excused from jury service because of that

14  appointment. She did not bring that to anyone's

15  attention. Based on that earlier excusal and the

16  fact that she has that appointment, she is excused

17  and an alternate will be substituted in her place.

18        Any objection to that?

19        MR. SCHMID: No, Your Honor.

20        MR. O'CONNOR: No, Your Honor.

21        THE COURT: We will stand in recess until

22  this trial at 10:00 a.m. tomorrow.

23        (The proceedings were adjourned.)

107

1        CERTIFICATE OF REPORTER

2

3        I, Sheila Dougherty, RMR and Official

4  Court Reporter of the Superior Court, State of

5  Delaware, do hereby certify that the foregoing is an

6  accurate transcript of the testimony adduced and

7  proceedings had, as reported by me, in the Superior

8  Court of the State of Delaware, in and for Kent

9  County, in the case therein stated, as the same

10  remains of record in the office of the Prothonotary

11  of Kent County, at Dover, Delaware.

12        WITNESS my hand this _____ day of

13  _____, A.D., 2002.

14

15

16

17

18

19                        Sheila A. Dougherty, RMR
                          Official Court Reporter
20                        Certification No. 142-PS

21

22

23

2

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR KENT COUNTY

STATE OF DELAWARE          ) C.A. No. IK01-10-0159
                           ) through 0173
    vs.                    )
                           )
HENRY W. GLANDING, JR.,    ) Appeal No. 236, 2002
I.D. No. 0105009486A       )
                           ) Trial Beginning:
    Defendant.             ) March 4, 2002

* * * * *

BEFORE: HON. HENRY DUPONT RIDGELY, PRESIDENT JUDGE,

and a jury

* * * * *

APPEARANCES:

JUN 2 5 2002

MARTIN B. O'CONNOR, ESQUIRE
Deputy Attorney General
on behalf of the State of Delaware.

LLOYD A. SCHMID, ESQUIRE
Assistant Public Defender
Attorney for Defendant.

TRANSCRIPT OF TRIAL
Volume B
Tuesday, March 5, 2002

SHEILA A. DOUGHERTY
Official Court Reporter

---

INDEX TO TESTIMONY

| PLAINTIFF'S WITNESSES: | PAGE |
|---|---|
| DARREN SHORT | |
| Direct By Mr. O'Connor . . . . . . . . . . . | 27 |
| Cross By Mr. Schmid . . . . . . . . . . | 36 |
| RODNEY LAYFIELD | |
| Direct By Mr. O'Connor . . . . . . . . . . | 39 |
| ROBERT KRACYLA | |
| Direct By Mr. O'Connor . . . . . . . . . . | 49 |
| Cross By Mr. Schmid . . . . . . . . . . | 58 |
| Redirect By Mr. O'Connor . . . . . . . . . . | 58 |
| MICHAEL CALLOWAY | |
| Direct By Mr. O'Connor . . . . . . . . . . | 60 |
| Cross By Mr. Schmid . . . . . . . . . . | 74 |
| Redirect By Mr. O'Connor . . . . . . . . . . | 86 |
| Recross By Mr. Schmid . . . . . . . . . . | 90 |
| Redirect By Mr. O'Connor . . . . . . . . . . | 104 |
| Recross By Mr. Schmid . . . . . . . . . . | 105 |
| Redirect By Mr. O'Connor . . . . . . . . . . | 106 |
| DAVID WEAVER | |
| Direct By Mr. O'Connor . . . . . . . . . . | 108 |
| Cross By Mr. Schmid . . . . . . . . . . | 125 |

SHEILA A. DOUGHERTY
Official Court Reporter

---

3

| DEFENDANT'S WITNESSES: | PAGE |
|---|---|
| MARY MULLINS | |
| Direct By Mr. Schmid . . . . . . . . . . | 130 |
| Cross By Mr. O'Connor . . . . . . . . . . | 139 |
| Redirect By Mr. Schmid . . . . . . . . . . | 144 |
| HENRY W. GLANDING, JR.. | |
| Direct By Mr. Schmid . . . . . . . . . . | 149 |
| Cross By Mr. O'Connor . . . . . . . . . . | 152 |

INDEX OF EXHIBITS

| STATE'S EXHIBITS: | For id | In ev. |
|---|---|---|
| A | 33 | |
| B | 53 | |
| C | 62 | |
| D, E and F | 65 | |
| G | 73 | |
| CC | 106 | |

---

4

| 1 | 34 |
|---|---|
| 2 | 45 |
| 3 | 55 |
| 4 | 63 |
| 5, 6 and 7 | 71 |
| 8 | 74 |
| 9 | 107 |
| 10 | 111 |
| 11 | 112 |
| 12 and 13 | 115 |
| 14 and 15 | 116 |
| 16 and 17 | 117 |
| 18 and 19 | 118 |
| 20, 21 and 22 | 119 |
| 23 and 24 | 120 |
| 25 | 120 |
| 26, 27, 28 and 29 | 124 |

SHEILA A. DOUGHERTY
Official Court Reporter

SHEILA A. DOUGHERTY
Official Court Reporter

```
                                    Courtroom No. 1
                                    March 5, 2002.
                                    10:30 a.m.
PRESENT:  As noted.
                    * * * * *
        (The jury was duly empaneled and sworn.)
                    * * * * *
        MR. O'CONNOR: Good morning, Your Honor.
        THE COURT: Any application before the
jury is brought in?
        MR. O'CONNOR: One thing, Your Honor. My
understanding, the defendant is going to stipulate
that he is in fact a convicted felon at the time
that he was arrested.
        THE COURT: Do you have a written
stipulation?
        MR. O'CONNOR: I provided one to
Mr. Schmid. I don't believe it has been signed yet.
        MR. SCHMID: Yes, Your Honor. In point of
fact that is my question. In conceding on the
record that we are prepared to acknowledge that he
did have a felony conviction prior to the time of
this arrest, we wonder at the need for a written
stipulation and would ask if the Court would
```

```
consider accepting our stipulation on the record,
and our acknowledgment that in fact we assume the
State would be requesting, and the Court would then
be instructing the jury as to the fact that he has
already admitted that, without in fact requiring a
written document.
        THE COURT: Well, this is an element of
the offense; is that right?
        MR. O'CONNOR: That's correct.
        THE COURT: Generally with regard to an
element of the offense, a written stipulation that
is signed and admitted as an exhibit.
        MR. SCHMID: If I may have a moment, Your
Honor.
        THE COURT: You may.
        Mr. Schmid.
        MR. SCHMID: Your Honor, with leave of the
Court, I have had an opportunity here to confer with
my client, and after a review of the pros and cons
in this matter, Mr. Glanding has elected to sign the
stipulation which for the record reads briefly: On
the 5th day of March, 2001, the above-referenced
defendant, Henry B. Glanding, stipulates as an
```

7

```
undisputed and established fact beyond a reasonable
doubt that the defendant was a convicted felon at
the time of his arrest on May 11, 2001.
        THE COURT: All right. Anything else?
        MR. O'CONNOR: Your Honor, just to let the
Court -- I sent Mr. Schmid a letter this morning
which basically said I would like him to sign this
stipulation, while not waiving basically any
opportunity to raise what his conviction was, if the
opportunity arose and if the Court allowed me to,
because the convictions were a long time ago. I
have some pretty high hurdles to get there, if we
ever got there, but I put that in the letter to
Mr. Schmid and I didn't want to let him think that I
expressly waived that, but I know I've got some
hurdles to climb if that ever came up and I had to
go there.
        THE COURT: All right. We will address
that if it is necessary.
        Is there anything else before the jury is
brought in?
        MR. O'CONNOR: Not from the State, Your
Honor.
```

8

```
        MR. SCHMID: No, Your Honor.
        THE COURT: Are you requesting any
sequestration order?
        MR. SCHMID: Yes, we are.
        MR. O'CONNOR: No opposition.
        THE COURT: With the exception of the
chief investigating officer, all witnesses are
sequestered.
        Bring the jury in.
        (The jury came into the courtroom.)
        THE COURT: Good morning, members of the
jury. We appreciate your patience in the jury room.
        The Court has excused Juror Number 7, so
at this time I would ask Alternate Number 1 to take
the seat of Juror Number 7.
        (Complied.)
        THE COURT: Henceforth I will be
addressing you as Juror Number 7.
        With regard to the instructions, members
of the jury, that I gave you previously, I told you
that you were not to discuss the case among
yourselves nor with anyone else; that if anyone
attempted to discuss the case with you to bring that
```

1  as I was able to maintain my line of sight and
2  communicate my intelligence.
3      MR. O'CONNOR: May I have one second?
4      Your Honor, may I have an item marked for
5  identification?
6      THE COURT: Mark the item for
7  identification.
8      THE CLERK: It has been marked as State's
9  for Identification A.
10     (State's Exhibit A marked for
11  identification.)
12     MR. O'CONNOR: May I approach the witness,
13  Your Honor?
14     THE COURT: Yes.
15  BY MR. O'CONNOR:
16     Q.  Detective, I am going to hand you what has
17  been marked as State's for Identification A. Do you
18  recognize that?
19     A.  Yes.
20     Q.  What is it?
21     A.  It is a picture of the defendant's
22  residence and the vehicles around his residence.
23     MR. O'CONNOR: Your Honor, the State at

1  this time moves State's Identification A as the
2  first State's Exhibit.
3      THE COURT: Any objection?
4      MR. SCHMID: No, Your Honor.
5      THE COURT: It is admitted. Mark it as a
6  State's Exhibit.
7      THE CLERK: It has been marked as State's
8  Exhibit 1.
9      (State's Exhibit 1 received into
10  evidence.)
11     MR. O'CONNOR: Your Honor, may I publish
12  the photograph to the jury?
13     THE COURT: Hand it to the bailiff.
14     (Complied.)
15     (Photograph was published to the
16  jury.)
17  BY MR. O'CONNOR:
18     Q.  Detective Short, I am going to hand you
19  back State's Exhibit 1. Looking at -- what does
20  that photograph represent?
21     A.  It represents where my position was. This
22  is the tree line, this is what I had to shoot over
23  with my scope. This was actually a video that I

35
Darren Short - Direct

1  took the day before I went out. This is with a Sony
2  Handycam, and I had zoomed out so as to take -- we
3  had to get the whole house, and in one picture, one
4  frame.
5      Q.  Does the picture reflect the maximum view
6  you had? In other words, were you able to see
7  closer than that picture reflects?
8      A.  Yes, I was able to actually -- with the
9  Leopold scope that I am assigned, I am able to
10  actually zoom in on like the door, front door, the
11  windows. I am able to bring it in so I can
12  concentrate on a -- basically so a person with just
13  a little bit of area around it, at this distance I
14  would be able to fill my scope and I would be able
15  to focus in on them and track them with my scope.
16  This was just for intelligence purposes, so I zoomed
17  out with the Handycam.
18     Q.  So you could get the whole house?
19     A.  So I could get the whole house, and so I
20  could give it to the investigator that was handling
21  the case so he would have a good view of the house
22  and what we were dealing with as to vehicles,
23  outbuildings, obstacles that may arise.

36
Darren Short - Direct

1      MR. O'CONNOR: If I can have one moment,
2  Your Honor.
3  BY MR. O'CONNOR:
4      Q.  What county was the defendant's residence
5  in?
6      A.  Kent County, State of Delaware.
7      MR. O'CONNOR: Your Honor, I don't have
8  any other questions for this witness.
9      THE COURT: You may cross-examine.
10     CROSS-EXAMINATION
11  BY MR. SCHMID:
12     Q.  Detective Short, just to make sure that I
13  understand, you observed Mr. Glanding in and around
14  the yard area?
15     A.  In the yard area, to and from the
16  vehicles, and in and out of the house through the
17  front door.
18     Q.  He was doing yard work?
19     A.  Yard work.
20     Q.  He was going back and forth to the vehicle
21  getting fish, cleaning them?
22     A.  Yes.
23     Q.  Okay. And that's the extent of the

Darren Short - Cross

38

Darren Short - Cross

1  observations that you made of Mr. Glanding; correct?
2      A.   Routine activities.
3      Q.   Yes.  And during the course of these
4  observations, you saw something on his hip which you
5  believed was a firearm?
6      A.   Yes.
7      Q.   Now, isn't it in fact true that you were
8  in radio communication with someone who was
9  supervising your activities?
10     A.   Yes, we had the --
11     Q.   That was Detective Calloway; correct?
12     A.   Detective Calloway was handling the
13 investigative end of it.  There were several people
14 monitoring the radio.
15     Q.   All right.  During the course of your
16 observations you said, Gee, I think that this man
17 has a pistol on his hip?
18     A.   I said it several times, that I believe it
19 to be, and I actually stated that it was a gun.
20     Q.   Well, okay.  But you through the course of
21 these observations said several times, Gee, I think
22 it is a gun; correct?
23     A.   Not, Gee, I think it was a gun.  I said,

1  It appears to be a gun on his right hip.
2      Q.   It appeared to be a gun?
3      A.   It is a gun.
4      Q.   Right.  Now, during the course of these
5  observations, did you see anyone else come up to the
6  house?
7      A.   No.  My focus was on him.
8      Q.   Well, I am not asking if your focus was on
9  him.  You had a view of the front of the residence
10 and the driveway; correct?
11     A.   Not that I recall.
12     Q.   Thank you.
13          MR. SCHMID:  Nothing further, Your Honor.
14          THE COURT:  Mr. O'Connor.
15          MR. O'CONNOR:  No further questions, Your
16 Honor.
17          THE COURT:  The witness may step down.
18          (The witness stepped down.)
19          THE COURT:  The State may call its next
20 witness.
21          MR. O'CONNOR:  The State calls Detective
22 Rodney Layfield.
23          Your Honor, may Detective Short be

39

Darren Short - Cross

1  excused?
2          THE COURT:  Any objection?
3          MR. SCHMID:  No, Your Honor.
4          THE COURT:  He is excused.
5                * * * * *
6                RODNEY LAYFIELD
7                * * * * *
8          called as a witness on the part and behalf
9          of the State, being duly sworn, was
10         examined and testified as follows:
11              DIRECT EXAMINATION
12 BY MR. O'CONNOR:
13     Q.   Good morning, Detective Layfield.
14     A.   Good morning.
15     Q.   Detective Layfield, how long have you
16 worked for Delaware State Police?
17     A.   I have been employed for approximately
18 eight years.
19     Q.   What is your current assignment?
20     A.   I am currently assigned to the Governors
21 Task Force in Sussex County, and also I am a member
22 of the Special Operations Response Team in the State
23 of Delaware.

40

Rodney Layfield - Direct



1      Q.   What troop do you work out of?
2      A.   Troop 4 in Georgetown.
3      Q.   Were you working on May 11, 2001?
4      A.   Yes, I was.
5      Q.   And what was your assignment that day?
6      A.   I was to observe a residence in Kent
7  County.
8      Q.   And can you describe to the jury
9  approximately what time you started it and where you
10 were deployed?
11     A.   Okay.  We were deployed at approximately
12 one o'clock in the afternoon, about 1300 hours.  We
13 moved into a position where we were able to observe
14 the target residence.  I would say it took us about
15 45 minutes to an hour to get into position, so we
16 were observing the residence from approximately two
17 o'clock until later on that evening, and I believe
18 we extracted around nine o'clock, 2100 hours or so.
19     Q.   Were you working with anybody else?
20     A.   Yes, I was.  I was also working with
21 another detective, Corporal Todd Thomas.  He and I
22 were in a position together.  When we normally
23 deploy to observe a residence, we go in pair of

*(handwritten in left margin: Residence.   Lift words   lift words)*

40



98

1　　　　MR. O'CONNOR: Your Honor, the issue that
2　I want to raise with respect to Detective Calloway
3　was testimony regards the fact that when he observed
4　items in the safe, a number of those items were the
5　defendant's items. The prejudicial part of the
6　items is that they are all Pagan-related material.
7　I wanted to inquire of the Detective whether or not
8　he saw items of the defendant's clothing and other
9　items that identified -- that were identified as
10　being the defendant's in the safe, without going any
11　further than that, to further establish that he had
12　access to the interior of the safe.
13　　　　I do not -- beyond that I don't want to
14　get into that it is Pagan material because I
15　understand Mr. Schmid will object. I don't really
16　agree with him, but to the prejudicial value at this
17　point, but that was the one question that I reserved
18　asking Detective Calloway.
19　　　　Quite frankly, we have a lot of evidence
20　tying the defendant, sufficient evidence I believe
21　tying the defendant to the home, to the vehicle, but
22　not to the interior of the safe where a variety of
23　these weapons were found.

SHEILA A. DOUGHERTY
Official Court Reporter

*Handwritten left margin:* No Constructive Possession

*Handwritten center margin:* to be supposed to suppose was shown Prejudice. The word Pagans was barred from my trial

100

1　　　　THE COURT: Make a proffer as to what you
2　would like to do.
3　　　　MR. O'CONNOR: Your Honor, I would like to
4　ask the detective whether or not in addition to
5　weapons found in the safe he located items of
6　clothing and other objects which he identified as
7　being the defendant's in the safe, with all the
8　weapons and bullets and those kind of things.
9　　　　MR. SCHMID: Your Honor, just to get the
10　full context, as I understand it none of these items
11　have the name Henry Glanding on them.
12　　　　MR. O'CONNOR: They have his nickname,
13　Hard Head, which is his Pagan nickname, all over
14　them. I can have someone from the State Police
15　intelligence unit testify outside the jury's
16　presence that the defendant's nickname is Hard Head,
17　or Detective Calloway can do that to establish the
18　nickname and this defendant.
19　　　　That is my only proffer, is that there was
20　clothing and other items in the safe belonging to
21　this defendant, and to the extent that --
22　　　　THE COURT: What precisely was the
23　clothing in the safe?

SHEILA A. DOUGHERTY
Official Court Reporter



99

1　　　　MR. O'CONNOR: A Pagan motorcycle jean
2　jacket.
3　　　　THE COURT: What size jacket?
4　　　　MR. O'CONNOR: It is the Pagan colors.
5　Has the name tag of Hard Head on it. There was a
6　walking stick, which is a staff kind of object that
7　appeared to me to be made out of an ax handle, for
8　lack of a better description, with the nickname Hard
9　Head running down the front of it, which is common
10　Pagan memorabilia.
11　　　　There was also some other things that --
12　Your Honor, I have some photographs.
13　　　　Judge, the first photograph is a close-up
14　of the nickname on the jacket.
15　　　　The second is a photograph of the jacket
16　in the gun locker.
17　　　　The third is a photograph of the front of
18　the jacket, which has the nickname, which would be
19　on the left side of the jacket.
20　　　　The fourth is a photograph of the back of
21　the jacket.
22　　　　The fifth is a photograph of the gun
23　locker, and in the bottom of the gun locker is

SHEILA A. DOUGHERTY
Official Court Reporter

*Handwritten left margin:* Barred - Supposed to be- Prejudice. Barred from trial on Prejudice.

1　reference to being one percent. That is referenced
2　throughout the defendant's Pagan memorabilia.
3　　　　THE COURT: I don't see that on this
4　photograph.
5　　　　MR. O'CONNOR: At the bottom, Your Honor.
6　In the bottom you will see the one percent. It is
7　white and red. The head of the Motorcycle
8　Association of America said only one percent of
9　motorcycle riders are convicted felons, and
10　apparently some motorcycle groups take that as a
11　badge of honor, being one percent.
12　　　　THE COURT: Is that the diamond, the white
13　diamond?
14　　　　MR. O'CONNOR: Yes, Your Honor.
15　　　　THE COURT: All right. Mr. Schmid.
16　　　　MR. SCHMID: Your Honor, I have a request
17　to make, and that is to only briefly show those
18　photos to my client. There seems to be some
19　question between us as to what is being referred to.
20　　　　THE COURT: Hand these to Mr. Schmid.
21　　　　THE BAILIFF: Yes, Your Honor.
22　　　　MR. SCHMID: Thank you. Did the Court
23　want the photos back?

SHEILA A. DOUGHERTY
Official Court Reporter

*Handwritten center margin:* Barred from trial. Prejudice.

1       THE COURT: All right. Your response,
2  Mr. Schmid, to the proffer.
3       MR. SCHMID: Well, Your Honor, we don't
4  stand here to dispute that those items were found in
5  the safe. Our concern is with the reference and how
6  far it goes, the proffer is --
7       MR. O'CONNOR: The proffer is: Did you
8  locate the defendant's jacket in the safe? Yes.
9       Did you locate other items that you
10 identified as being personal property of the
11 defendant's in the safe? Yes.
12      That's it. No reference even to his
13 nickname.
14      MR. SCHMID: To the extent that that's the
15 outer limit of what the State is going to do, we
16 decline to offer any objection.
17      THE COURT: All right. You may proceed in
18 that fashion.
19      MR. O'CONNOR: Thank you, Your Honor.
20      For the Court's information, I would like
21 to briefly recall Detective Calloway and then I am
22 going to be calling Detective Weaver.
23      Your Honor, there is a cart over here with

1  a number of firearms, and the firearms and
2  ammunition on the top. I had taken a photograph of
3  all the ammunition, or actually three or four
4  photographs, which I would substitute for the actual
5  ammunition, assuming that there is no objection, for
6  safety purposes.
7       There is a couple -- there are a couple of
8  firearms that had the inventory still attached as
9  far as presenting, but I would expect it to be cut
10 off. Has the ammunition still attached to it. I
11 would like to show the jury the ammunition and
12 essentially swap the photos in evidence.
13      MR. SCHMID: I don't oppose that procedure
14 with respect to the ammunition, Your Honor. I would
15 ask, though, if those are a fair number of them, and
16 they are rifles, if they could be premarked and have
17 the identification sticker put on them before we get
18 before the jury.
19      MR. O'CONNOR: I don't have any problem
20 with that, Your Honor. The detective just came
21 over. If you would like to do that now, we can.
22 Really Detective Weaver is the next witness. I have
23 two questions for Detective Calloway, so it may make

1  sense to do that.
2       THE COURT: All right. All of the
3  exhibits may be premarked. Hand them to the clerk
4  and they will be marked for identification only. We
5  will take a recess while that is done.
6       Court is in recess until the call of the
7  court.
8       (A brief recess was taken.)
9       THE COURT: Are you ready to proceed?
10      MR. SCHMID: Yes, Your Honor.
11      THE COURT: Bring the jury in.
12      (The jury came into the courtroom.)
13      THE COURT: Good afternoon, members of the
14 jury. We appreciate your patience in the jury room.
15 We used the time you were there to do some things
16 administratively to expedite the presentation of the
17 evidence. In the long run there is that gain in
18 terms of your time.
19      Mr. O'Connor, you may call your next
20 witness.
21
22
23

49

1       MR. O'CONNOR: Your Honor, the State
2  briefly recalls Detective Calloway.
3                * * * * *
4              MICHAEL CALLOWAY
5                * * * * *
6          having been previously sworn as a witness,
7          was resumed on examination and testified
8          further as follows:
9              REDIRECT EXAMINATION
10 BY MR. O'CONNOR:
11     Q.   Good afternoon, Detective.
12     A.   Good afternoon.
13     Q.   Detective, when you participated in the
14 search warrant of the defendant's residence, did you
15 have an opportunity to look inside of his gun
16 cabinet?
17     A.   That's correct.
18     Q.   The gun cabinet?
19     A.   That's correct.
20     Q.   Did you observe a jacket belonging to the
21 defendant in the gun cabinet?
22     A.   Yes, I did.
23     Q.   Did you observe other personal belongings

1  BY MR. O'CONNOR:
2      Q.   Detective Weaver, have you had an
3  opportunity to review --
4          THE COURT:  Affix the remote microphone to
5  the witness, Madam Bailiff.
6          (Complied.)
7  BY MR. O'CONNOR:
8      Q.   Detective Weaver, in the two boxes on this
9  cart are several evidence bags.  Can you briefly
10 tell the jury what is in them?
11     A.   Inside of the bags contain ammunition that
12 was seized from the gun cabinet that was located
13 inside the living room.  There is --
14     Q.   If you can just take some out.
15     A.   There is .20 gauge, .12 gauge ammunition,
16 rifle slugs for .12 gauge, heavy game load for .12
17 gauge.  There are six.  There were 17 303 cartridges
18 that were inside of a Federal box.
19     Q.   With respect to this envelope, is this the
20 six bullets or cartridges that you found in the tan
21 jacket in the defendant's vehicle?
22     A.   Yes, sir.  Black rifle powder and powder
23 from Superior Hannitol.

SHEILA A. DOUGHERTY
Official Court Reporter

1      Q.   What are those used for?
2      A.   Used for black powder.
3      Q.   Approximately how many live rounds of
4  ammunition would you estimate were seized at the
5  residence?
6      A.   There was approximately 30 boxes of
7  ammunition that was seized.  Different size
8  calibers.
9      Q.   Did you have an opportunity to consider
10 the caliber of the weapons and the caliber of the
11 ammunition?
12     A.   The ammunition that was located inside the
13 gun cabinet was consistent with the weapons that
14 were seized inside the residence.
15         MR. O'CONNOR:  Your Honor, at this time we
16 aren't going to be admitting the actual ammunition
17 into evidence.  The State would like to admit some
18 photographs.  We have now laid a foundation through
19 Detective Weaver.
20 BY MR. O'CONNOR:
21     Q.   Detective Weaver, I am handing you what
22 has been marked as State's for Identification W.
23     A.   This is photographs of the ammunition that

SHEILA A. DOUGHERTY
Official Court Reporter

123

David Weaver - Direct

1  was located inside the residence in the gun cabinet.
2      Q.   State's for Identification Q?
3      A.   More ammunition that was located inside
4  the gun cabinet.
5      Q.   State's for Identification Y?
6      A.   Indicates more ammunition that was located
7  inside the gun cabinet.
8      Q.   State's for Identification Z?
9      A.   This is the black powder rifle and other
10 type of ammunition that was found inside the gun
11 cabinet.
12     Q.   Do the photographs represent the
13 ammunition in evidence in these bags?
14     A.   Yes, sir.
15     Q.   Was all of the ammunition found in the gun
16 cabinet, or are there different locations?
17     A.   They were found inside of the gun cabinet.
18     Q.   If one of your evidence bags indicates
19 otherwise, for example, on top of the cabinet, would
20 that be correct?
21     A.   Yes.  One indicates coffee table in the
22 living room, another one with coffee table in the
23 living room, top of the gun cabinet in the living

SHEILA A. DOUGHERTY
Official Court Reporter

124

David Weaver - Direct

1  room, top of the washing machine, and inside the gun
2  cabinet in the living room.
3          MR. O'CONNOR:  Your Honor, the State would
4  offer State's for Identification W, X, Y and Z as
5  the next four State's Exhibits.
6          THE COURT:  Any objection?
7          MR. SCHMID:  No, Your Honor.
8          THE COURT:  Mark the items as the next
9  State's Exhibits.
10         THE CLERK:  They have been marked as
11 State's Exhibits 26 through 29 respectively.
12         (State's Exhibit 26, 27, 28 and 29
13 received into evidence.)
14         (The witness resumed the witness stand.)
15 BY MR. O'CONNOR:
16     Q.   Detective, with respect to the ammunition,
17 the firearms and that evidence, did you follow
18 standard operating procedure in seizing and logging
19 that evidence in?
20     A.   Yes.  The evidence was recovered at the
21 residence, taken back to Troop 3 and secured in our
22 evidence locker.
23         MR. O'CONNOR:  If I can have one moment,

SHEILA A. DOUGHERTY
Official Court Reporter

David Weaver - Direct

1   Your Honor.

2          No further questions for this witness,

3   Your Honor.

4          THE COURT:  You may cross-examine.

5          MR. SCHMID:  Thank you, Your Honor.

6                  CROSS-EXAMINATION

7   BY MR. SCHMID:

8      Q.   Detective Weaver, good afternoon.

9      A.   Good afternoon.

10     Q.   What time did you arrive at the vehicle

11  out on Lion Hope Road?

12     A.   I arrived at 2040 hours.

13     Q.   What is that in layman's terms?

14     A.   I am sorry.  8:40 p.m.

15     Q.   Okay.  And how long were you there at the

16  vehicle?

17     A.   I was there approximately an hour.

18     Q.   And when you left the scene there, at the

19  vehicle, did you go directly to the residence?

20     A.   Yes, sir.

21     Q.   So you arrived there somewhere close to

22  ten o'clock?

23     A.   Yes, sir.

SHEILA A. DOUGHERTY
Official Court Reporter

---

David Weaver - Cross

1      Q.   And when you arrived there, what were the

2   officers there engaged in?

3      A.   There were officers from our units that

4   were inside the residence doing a search of the

5   residence.

6      Q.   Okay.  And were they all standing around

7   waiting for you to arrive?

8      A.   I don't recall.  There were several that

9   were going to assist Detective Daisey, assisting

10  with the collection of evidence.

11     Q.   My question has to do with were all of

12  these officers who were at the residence simply

13  doing nothing and waiting until you got there?

14     A.   No, sir.  There were officers doing

15  examinations.

16     Q.   Okay.  And prior to going out to the car

17  you hadn't been into the residence, right?

18     A.   No, sir.

19     Q.   Any idea what time the officers finished

20  up there at the house?  The other officers, I mean?

21     A.   I am not sure what time they had finished

22  up.

23     Q.   What time did you finish?

SHEILA A. DOUGHERTY
Official Court Reporter

*(handwritten in margin: LEFT Residence Not on Property)*

---

127

David Weaver - Cross

1      A.   We cleared out approximately 11:55.  PM.

2      Q.   Were there other officers still at the

3   scene when you left?

4      A.   I believe we had all left together.

5      Q.   Okay.  You identified three items as

6   having been on a gun rack; correct?

7      A.   Yes, sir.

8      Q.   They were a .20 gauge -- rather two .20

9   gauge shotguns and a .22 caliber rifle; correct?

10     A.   Yes, sir.

11     Q.   Was there also a BB gun there on the rack

12  that you recall?

13     A.   I do not recall.

14     Q.   Okay.  Were all of the items still on the

15  rack at the time that you got there?

16     A.   We collected, yes.

17     Q.   When you were in the laundry room where

18  those items were found on the gun rack, did you

19  happen to notice what else was in the laundry area

20  there?

21     A.   No, sir, I did not.

22          MR. SCHMID:  Nothing further, Your Honor.

23          THE COURT:  Mr. O'Connor.

SHEILA A. DOUGHERTY
Official Court Reporter

*(handwritten in left margin: NIGHTTIME HOURS)*

---

128

1          MR. O'CONNOR:  No further questions, Your

2   Honor.

3          THE COURT:  The witness may step down.

4          (The witness stepped down.)

5          THE COURT:  Mr. O'Connor?

6          MR. O'CONNOR:  If I could have one second,

7   Your Honor.

8          Your Honor, at this point the State rests.

9          THE COURT:  Members of the jury, there is

10  going to be a recess before we consider anything

11  further in the courtroom.  The bailiff will show you

12  to the jury room.

13          (The jury left the courtroom.)

14          THE COURT:  Counsel come to sidebar on

15  scheduling.

16          (A sidebar conference was held off

17  the record.)

18          THE COURT:  Court is in recess for 15

19  minutes.

20          (A brief recess was taken.)

21          MR. SCHMID:  Your Honor, I had some

22  difficulty in locating Ms. Mullins.  She has stepped

23  out.  I have not yet been able to ask my client.  I

SHEILA A. DOUGHERTY
Official Court Reporter

COUNSEL SHOULD OF REVISED ME TO EXERCISE MIRANDA Right. [handwritten margin note]

1  needed to show her if she had access -- I am talking
2  about the firearms. I need still to speak to my
3  client about his intentions with respect to
4  testifying.
5       THE COURT: All right. We will stand in
6  recess for ten minutes.
7       (A brief recess was taken.)
8       THE COURT: Mr. Schmid, are you ready to
9  proceed?
10      MR. SCHMID: Yes, we are, Your Honor, and
11 I will advise the Court that my client will be
12 testifying.
13      THE COURT: All right. Bring the jury in.
14      (The jury came into the courtroom.)
15      THE COURT: Mr. Schmid, does the defense
16 elect to present evidence?
17      MR. SCHMID: Yes, Your Honor.
18      THE COURT: You may call your witness.
19      MR. SCHMID: Defense calls Mary Mullins to
20 the stand.
21
22
23

SHEILA A. DOUGHERTY
Official Court Reporter

---

1       * * * * *
2            MARY MULLINS
3            * * * * *
4       called as a witness on the part and behalf
5       of the Defense, being duly sworn, was
6       examined and testified as follows:
7            DIRECT EXAMINATION
8  BY MR. SCHMID:
9       Q.  Ms. Mullins, good afternoon.
10      A.  Good afternoon.
11      Q.  Where do you live?
12      A.  829 Lion Hope Road, Clayton, Delaware,
13 19948.
14      Q.  How long have you lived there?
15      A.  Going on eight years.
16      Q.  Is that also the residence of Henry
17 Glanding?
18      A.  Yes.
19      Q.  Who else lives there?
20      A.  My three children, Ashley, Gregory and
21 Angela.
22      Q.  How old is Ashley?
23      A.  Thirteen.

SHEILA A. DOUGHERTY
Official Court Reporter

---

131
Mary Mullins - Direct

1       Q.  How old is Gregory?
2       A.  Eleven.
3       Q.  And Angela?
4       A.  Eight.
5       Q.  Did you live there May 11 of last year?
6       A.  Yes.
7       Q.  Now, did you hunt?
8       A.  Yes, occasionally.
9       Q.  When did you start?
10      A.  At the age of 18.
11      Q.  Pardon me for asking. How old are you
12 now?
13      A.  Thirty-two.
14      Q.  So that is approximately 14 years you have
15 been hunting?
16      A.  Yes.
17      Q.  Did you hunt after moving in with
18 Mr. Glanding?
19      A.  Yes.
20      Q.  And how often?
21      A.  Probably a total of eight times. Because
22 of Girl Scouts I couldn't go every year.
23      Q.  When you say "Girl Scouts," what do you

SHEILA A. DOUGHERTY
Official Court Reporter

---



132
Mary Mullins - Direct

1  mean?
2       A.  I have -- I am an assistant leader of a
3  Girl Scout troop, and my older daughter, Ashley, and
4  during the month of November we have cookie training
5  and a cookie shoot off which we have to attend for a
6  weekend at Grove Point in Maryland. So it sometimes
7  fell on the weekend when hunting started, sometimes
8  it didn't. And I also work at Boscov's when
9  Christmas season starts, and I don't have the time
10 to take off.
11      Q.  Does that entail working overtime, too?
12      A.  Yes.
13      Q.  Now, did you bring any guns with you or
14 did you acquire any guns after you got to the
15 residence?
16      A.  Yes, I did.
17      Q.  Did you also acquire a unit to put them
18 in?
19      A.  Yes.
20      Q.  What was that?
21      A.  It was a gun cabinet.
22      Q.  Where was that gun cabinet located?
23      A.  At my residence right now.

MRS. MULLINS GUN CABINET + GUNS. [handwritten margin note]

SHEILA A. DOUGHERTY
Official Court Reporter

133

MRS. MULLINS CABINET + GUNS

1    MR. SCHMID:  May I approach the
2    prothonotary, Your Honor, to retrieve an exhibit?
3    THE COURT:  You may.
4    MR. SCHMID:  May I approach the witness,
5    Your Honor?
6    THE COURT:  Yes.
7    BY MR. SCHMID:
8    Q.   Ms. Mullins, I hand you what has been
9    marked State's Number 4 and ask if you recognize
10   that.
11   A.   Yes.
12   Q.   What is that?
13   A.   My gun cabinet.
14   Q.   Okay.
15   MR. SCHMID:  May I publish briefly to the
16   jury, Your Honor?
17   THE COURT:  All right.
18   MR. SCHMID:  Thank you.
19   (The exhibit was published to the jury.)
20   BY MR. SCHMID:
21   Q.   Did you have any of your guns in that gun
22   safe?
23   A.   Yes.

SHEILA A. DOUGHERTY
Official Court Reporter

134

1    MR. SCHMID:  Your Honor, may I retrieve
2    certain of the exhibits from the prothonotary?
3    THE COURT:  Yes.
4    MR. SCHMID:  Thank you.
5    BY MR. SCHMID:
6    Q.   I hand you State's Exhibit Number 12, a
7    .45 caliber Connecticut Valley Arms black powder
8    rifle, and ask if you recognize that.  Please hold
9    the barrel up or down.  Who does that belong to?
10   A.   Me.
11   Q.   Okay.  I hand you --
12   THE COURT:  Mr. Schmid, unless necessary
13   to address at sidebar, you may show the firearm to
14   the witness rather than handing it to her.
15   MR. SCHMID:  Thank you.
16   BY MR. SCHMID:
17   Q.   I show you what has been marked State's
18   23, a .20 gauge Remington 870 Express, and ask if
19   you recognize that.
20   A.   Yes.
21   Q.   Whose is that?
22   A.   That is mine.
23   Q.   Could you please speak up for the benefit

Her Guns

SHEILA A. DOUGHERTY
Official Court Reporter

135

Mary Mullins - Direct

1    of all in the courtroom?  Did you say that is yours?
2    A.   Yes.
3    Q.   I show you Number 25, State's 25, a .22
4    caliber rifle.  Ask if you recognize that.
5    A.   Yes.
6    Q.   Whose is this?
7    A.   My son's.
8    Q.   Where did you get this?
9    A.   He got it from his grandfather in West
10   Virginia.
11   Q.   Okay.  I show you what has been marked
12   State's Number 20, a .410 single-shot shotgun, and
13   ask if you recognize that.
14   A.   Yes.
15   Q.   Could you please pull the seat a little
16   closer to the microphone.  Whose is this?
17   A.   .410 is my son's.
18   MR. O'CONNOR:  Your Honor, if I could ask
19   Mr. Schmid to repeat the exhibit number.
20   MR. SCHMID:  Number 20.
21   MR. O'CONNOR:  Thank you.
22   BY MR. SCHMID:
23   Q.   Ms. Mullins, I show you what has been

Her Guns

SHEILA A. DOUGHERTY
Official Court Reporter

136

Mary Mullins - Direct

1    marked State's Number 16, a .12 gauge semiauto
2    shotgun with a scope, and ask if you recognize this.
3    A.   Yes.
4    Q.   Is this in the same form as it was when it
5    was in the gun cabinet?
6    A.   No.
7    Q.   What is different about it?
8    A.   The scope has been taken off.
9    Q.   Okay.  Would that make it difficult for
10   you to recognize?
11   A.   Yes.
12   Q.   And whose is this?
13   A.   Mine.
14   Q.   Okay.  Ms. Mullins, did you use these guns
15   for hunting purposes?
16   A.   Yes.
17   Q.   Was there someone else who resided at the
18   residence?
19   A.   They didn't live with us, but his --
20   Mr. Glanding's -- two children visited us every
21   other weekend for visitation rights.
22   Q.   Who are they?
23   A.   Henry Glanding III, and Frances Glanding.

Her Guns

SHEILA A. DOUGHERTY
Official Court Reporter

53

1    Q.   How old is Henry?

2    A.   He just turned 12.

3    Q.   And I am sorry, the daughter's name?

4    A.   Frances.

5    Q.   How old is Frances?

6    A.   She just turned nine.

7    Q.   And to your knowledge did Henry Glanding,

8    Junior, also have guns there in the house?

9    A.   Yes.

10   Q.   Did he come over to the house and shoot

11   them?

12   A.   Yes, he did.

13   Q.   The .22 caliber rifle?

14        MR. SCHMID:  I am sorry.  Your Honor, may

15   I retrieve one of the exhibits again, please?

16        THE COURT:  Yes.

17        MR. SCHMID:  In this instance, Your Honor,

18   I would ask for leave of the Court to be able to

19   have the witness closely examine the rifle.  There

20   is an identifying mark I need to ask her to make

21   comment on.

22        THE COURT:  All right.

23

SHEILA A. DOUGHERTY
Official Court Reporter

---

1    BY MR. SCHMID:

2    Q.   Is there anything unique or peculiar to

3    this weapon which would assist you in identifying

4    it?

5    A.   Yes.  The little daisy.

6    Q.   The flower mark on the top of the reserve?

7    A.   Yes.

8    Q.   Any writing or other marks there?

9    A.   Yes, there is other marks, but I always

10   have identified it by the flower, the daisy.

11   Q.   How did you refer to this weapon, its

12   country of origin?  What did you call it?

13   A.   What did I call it?  I have always called

14   them a gun.  I never --

15   Q.   You didn't call it a Japanese gun?

16   A.   No.  Just a gun.

17   Q.   Did you have some difficulties with

18   Mr. Glanding during the early part of last year?

19   A.   Yes.

20   Q.   And were there times when you left the

21   residence?

22   A.   Yes.

23   Q.   How long total would you say that you were

SHEILA A. DOUGHERTY
Official Court Reporter

---

139
Mary Mullins - Direct

1    gone from the residence?

2    A.   Overnight.

3    Q.   But for the total number of days off and

4    on, what would that total have been all together?

5    A.   We started having problems at Christmas,

6    so probably seven or eight times.

7    Q.   A total of about a week's worth of days

8    that you left?

9    A.   Yes.

10        MR. SCHMID:  Nothing further, Your Honor.

11        THE COURT:  You may cross-examine.

12            CROSS-EXAMINATION

13   BY MR. O'CONNOR:

14   Q.   Ms. Mullins, who owns the residence at

15   829 Lion Hope Road?

16   A.   Mr. Glanding.

17   Q.   And did he own it prior to you moving in?

18   A.   Yes.

19   Q.   With respect to this gun cabinet, do you

20   have a key to the gun cabinet?

21   A.   Yes.

22   Q.   Does anybody else have a key to the gun

23   cabinet?

SHEILA A. DOUGHERTY
Official Court Reporter

---

140
Mary Mullins - Cross



1    A.   Yes.

2    Q.   Who?

3    A.   I gave Mr. Glanding one.

4    Q.   Aside from Mr. Glanding, does anybody else

5    have a key to the gun cabinet?

6    A.   No.

7    Q.   You have told the jury that you

8    occasionally hunt and you have three kids?

9    A.   Yes.

10   Q.   And you are working?

11   A.   Yes.

12   Q.   So it is fair to say you don't have much

13   time to hunt?

14   A.   No.

15   Q.   You stated that you brought the guns to

16   the residence.  Did you buy the gun cabinet because

17   of your children, to keep the guns away from your

18   children as they were growing older?

19   A.   Yes.  I bought it when my first daughter

20   was born.

21   Q.   You identified five guns on the gun

22   cabinet that were yours?

23   A.   Yes.

SHEILA A. DOUGHERTY
Official Court Reporter

138

ALL guns was Sheila Mullins

AKC (MRS.) To whom was Ask

Registered To Never Registered

Question Never Ask Registered

54

1    Q.   If there was ammunition in the gun cabinet
2  that didn't match your guns, was that your
3  ammunition?
4       A.   No.
5       Q.   Whose ammunition would that be?
6       A.   I don't know.
7       Q.   If there was a gun in the gun cabinet that
8  wasn't yours, from the five you identified, whose
9  gun would that be?
10      A.   Either little Henry's or somebody else's.
11      Q.   But the defendant did have a key to the
12 gun cabinet?
13      A.   Yes.
14      Q.   Did you own any handguns?
15      A.   I didn't, no.
16      Q.   So if there were three handguns seized by
17 the police on May 11, none of those were yours?
18      A.   No.
19      Q.   If there were two handguns in the gun
20 cabinet, neither of those handguns were yours?
21      A.   No.
22      Q.   Mr. Schmid asked you a question about
23 whether you were off and on with Mr. Glanding.  Do

1  you recall that?
2       A.   Yes.
3       Q.   That evening were you intent -- the
4  evening of May 11 -- were you intending on staying
5  at the house?
6       A.   No.
7       Q.   Where were you going to stay?
8       A.   I was going home to get clothes because I
9  had a Girl Scout function that weekend, me and my
10 two daughters.
11      Q.   There were -- were all the guns that you
12 owned in the gun cabinet?
13      A.   Yes, they should have been.
14      Q.   So if there were guns in the washroom on
15 the wall, those were not your guns?
16      A.   No.
17      Q.   You have testified that Henry, Junior, and
18 I think you meant to say Henry III, the defendant's
19 son?
20      A.   Little Henry.
21      Q.   Little Henry.  Had some guns at the house,
22 correct?
23      A.   Yes.

143

Mary Mullins - Cross

1       Q.   And why were those guns kept in Clayton?
2       A.   In Clayton at our residence?
3       Q.   Yes.
4       A.   Because he currently stays with his aunt
5  in Baltimore, Maryland.  She does not allow any of
6  them.
7       Q.   So is it fair to say that the defendant
8  was holding his guns for him at 829 Lion Hope Road?
9       A.   We were.
10      Q.   You both were.  Have you ever seen the
11 defendant hunt?
12      A.   No.
13      Q.   Never gone hunting with him?
14      A.   No.
15      Q.   If there were -- if there was ammunition
16 in 829 Lion Hope Road that was not in the gun
17 cabinet, was that your ammunition?
18      A.   I would say no because mine should have
19 been locked up.
20      Q.   Was it the defendant's?
21      A.   I am not sure.
22      Q.   But it is fair to say that only you and he
23 had access to the gun cabinet?

144

Mary Mullins - Cross

1       A.   Only us two had a key, yes.
2       Q.   And it was the defendant's house?
3       A.   Yes.
4       Q.   And no other adults lived there?
5       A.   No.
6       Q.   Had any other adults lived there since you
7  moved in in 1996?
8       A.   Since I moved in, no.
9       Q.   You said that is about eight years ago?
10      A.   Yes.
11           MR. O'CONNOR:  Nothing further, Your
12 Honor.  If I could have a moment, Your Honor.
13           THE COURT:  All right.
14           MR. O'CONNOR:  No further questions.
15           THE COURT:  Mr. Schmid.
16           MR. SCHMID:  Thank you, Your Honor.
17           REDIRECT EXAMINATION
18 BY MR. SCHMID:
19      Q.   Ms. Mullins, who pays the utilities in the
20 house?
21      A.   I do.
22      Q.   Do you make any other payments in the
23 house?

She lived there

Mary Mullins - Redirect

*[handwritten left margin: AMMO WAS MRS. MULLINS'S TO BE MRS. MULLINS CLOUSE BECAUSE PROVIDE...]*

1  A. I currently am paying the mortgage, yes.
2  Q. And other associated taxes, et cetera?
3  A. Yes.
4  Q. Now, you were asked about ammunition. A
5  lot of the ammunition was purchased by you; correct?
6  A. Yes.
7  Q. At Boscov's?
8  A. Boscov's Department Store, yes.
9  Q. Was there any special occasion that
10 prompted you to buy any of this ammunition?
11 A. Boscov's is doing away with selling
12 weapons, so they had a sale on all their weapons and
13 ammunition. I get a 15 percent discount, so I
14 bought up what I could use.
15 Q. Was that a significant quantity?
16 A. Yes.
17 Q. Certain of the ammo has Boscov's price
18 tags on it.
19 A. Yes, they should.
20 Q. Is it fair to say that all the ammo that
21 has that tag on it you purchased?
22 A. Yes.
23    MR. SCHMID: Nothing further, Your Honor.

*[handwritten middle margin: I (Counsel) whether Ineffective Relevant. IT IS RELEVANT or not. NEW or not.]*

1     THE COURT: Mr. O'Connor.
2     MR. O'CONNOR: Nothing further.
3     THE COURT: The witness may step down.
4     (The witness stepped down.)
5     THE COURT: Mr. Schmid.
6     MR. SCHMID: Your Honor, the defense calls
7  Mr. Glanding to the stand.
8     MR. O'CONNOR: Your Honor, may counsel
9  approach?
10    THE COURT: You may.
11    Swear the witness.
12    (The following proceedings occurred
13 at sidebar.)
14    MR. O'CONNOR: Your Honor, there has been
15 a suggestion that the defendant may or may not have
16 known that he was not allowed to possess firearms
17 because he is a convicted felon. I want to ask that
18 the Court instruct Mr. Schmid not to inquire in that
19 regard because it is not a valid defense, whether he
20 knew he was not allowed to possess firearms or not.
21    And secondly, that it would confuse the
22 jury and take away from the issues for which they
23 are to decide the case, that being that whether or

SHEILA A. DOUGHERTY
Official Court Reporter

*[handwritten: JURY WAS INSTRUCTED ON THIS BASE TO FIND ME GUILTY (147)]*

SHEILA A. DOUGHERTY
Official Court Reporter

(148)

*[handwritten left margin: KNOWINGLY IS NOT ENOUGH CONSTRUCTIVE POSS. HAS TO BE PROVEN / STILL WITH ME?]*

1  not he knowingly possessed the guns and was a
2  convicted felon.
3     There is no element or defense in this
4  case whether the defendant knew that he wasn't
5  permitted to have the weapons, and I would ask that
6  Mr. Schmid be instructed not to go into that.
7     MR. SCHMID: I am passingly familiar with
8  the case where because the individual had not
9  been -- referring to Mr. Baumeister's cases --
10 because he had not been adequately advised of his
11 limitations with respect to the ownership or
12 possession of firearms, he was acquitted on a charge
13 of carrying, a person prohibited. So that is in
14 fact the case, that is the evidence.
15    I don't think it is appropriate for
16 counsel to limit my instruction, and if there is a
17 question about that I ask for a time to go to
18 the -- to call my witness and attempt to put our
19 case on.
20    MR. O'CONNOR: Your Honor, where I am
21 coming to is if the defendant was acquitted perhaps
22 the prosecutor would ask that he be excluded, but
23 for an indictment for evidence, and there is a

*[handwritten right margin: of should ATTORNEY should of used this especially my]*

1  million reasons why that defendant may have been
2  acquitted, and I don't think that is basis for the
3  allowance of this type of a defense, which is not a
4  defense in this case, and for that reason I would
5  object. That is my reason, Your Honor.
6     THE COURT: All right. Counsel, knowledge
7  applies to the possession of a weapon but to the
8  prohibited person aspect of the case. Therefore,
9  any questions addressing knowledge that he was a
10 prohibited person is not relevant. You may of
11 course address the issue of knowledge to the extent
12 it is relevant as to the elements of this case.
13    (The proceedings at sidebar were
14 concluded.)
15    THE COURT: Mr. Schmid.
16    MR. SCHMID: Thank you, Your Honor.
17        * * * * *
18        HENRY W. GLANDING, JR.
19        * * * * *
20    called as a witness on the part and behalf
21    of the Defense, being duly sworn, was
22    examined and testified as follows:
23

1    DIRECT EXAMINATION

2    BY MR. SCHMID:

3        Q.    Mr. Glanding, you reside at the residence

4    on 829 Lion Hope Road; correct?

5        A.    Yes.

6        Q.    And your son also -- Henry, Junior, or

7    III -- resided there with you on alternate weekends?

8        A.    On alternate weekends, through the summer,

9    like his birthday and some of the holidays.

10   Sometimes it would be every weekend, sometimes the

11   aunt would allow me to have him for two to three

12   weeks through the summer.

13       Q.    And you have seen several rifles,

14   firearms, paraded here in the courtroom by the

15   State?

16       A.    Yes.

17       Q.    Among them are .12 gauge and smaller gauge

18   guns; correct?

19       A.    Yes.

20       Q.    Can you describe your understanding of

21   what the difference would be between a .12 gauge,

22   .20 gauge and a .410?

23       A.    .12 gauge is the bigger person's gun, .20

---

1    gauge and .410 is for women.  Some women shoot .12

2    gauge, .20 gauge and a .410 is usually for youth.

3        Q.    Ms. Mullins has identified --

4            MR. SCHMID:  Excuse me just a moment, Your

5    Honor.

6    BY MR. SCHMID:

7        Q.    -- has identified a .20 gauge and a .410

8    gauge as belonging to her.  There are some other

9    smaller gauge shotguns that are included in the

10   list.  Whose were there?

11       A.    Her son was using one or two of the guns

12   that were his, and my son was using four or five of

13   the guns.

14       Q.    With respect to the small caliber

15   shotguns, where did they come from, the ones that

16   belonged to Henry III?

17       A.    One was a gift for Christmas.

18       Q.    From who?

19       A.    One come from Mary Mullins' uncle, which

20   was a Christmas present.

21       Q.    Okay.

22       A.    One was a Christmas present from a friend

23   of mine over in Maryland.  Guy named Marty Allen.

---

1        Q.    Did any come from other family members?

2        A.    Some come from relatives on my mother's

3    side, some come from my father's side.

4        Q.    What about the .22 caliber --

5            MR. SCHMID:  Your Honor, may I retrieve

6    one of the exhibits?

7            THE COURT:  Yes.

8    BY MR. SCHMID:

9        Q.    I show you Exhibit 14, State's Exhibit 14,

10   a .22 caliber Marlin semiauto rifle, and ask if you

11   recognize that.

12       A.    Yes.

13       Q.    Whose gun was that?

14       A.    My son's.

15       Q.    There is then black powder rifles and

16   several .12 gauge shotguns, a couple of pistols in

17   the house?

18       A.    Yes.

19       Q.    Do you acknowledge that you had those

20   guns?

21       A.    Yes.

22       Q.    Did Ms. Mullins bring guns to the

23   residence when she came to live with you?

---

1        A.    Yes.

2        Q.    Did she acquire other guns while she was

3    there?

4        A.    Yes.

5        Q.    Those guns that she has identified --

6        A.    Yes.

7        Q.    -- they were not yours?

8        A.    No.

9            MR. SCHMID:  I have nothing further, Your

10   Honor.

11           THE COURT:  You may cross-examine.

12               CROSS-EXAMINATION

13   BY MR. O'CONNOR:

14       Q.    Mr. Glanding, Ms. Mullins has testified

15   that five of the 15 guns were hers.  Do you recall

16   her testimony?

17       A.    Yes.

18       Q.    Of the remaining ten guns, it is your

19   testimony they were either your son's or yours?

20           MR. SCHMID:  Your Honor, may counsel

21   approach?

22           THE COURT:  You may.  Court reporter come

23   forward.

1    (The following proceedings occurred
2 at sidebar.)
3        MR. SCHMID: Your Honor, with apologies to
4 the Court, as I have stood here in front of the
5 bench I have recounted. I was going to object to
6 what Mr. O'Connor proffered. He is in fact correct,
7 and I apologize for that.
8        THE COURT: All right.
9        (The proceedings at sidebar were
10 concluded.)
11        THE COURT: You may proceed.
12        MR. O'CONNOR: Thank you.
13 BY MR. O'CONNOR:
14    Q.  Again, Ms. Mullins testified that five of
15 the firearms were hers that she identified. Do you
16 recall her testimony?
17    A.  Yes.
18    Q.  The remaining ten firearms that were
19 recovered by the police are either yours or your
20 son's?
21    A.  Both of ours, mine and my son's.
22    Q.  Correct. They are either yours or your
23 son's or both, correct?

                    SHEILA A. DOUGHERTY
                    Official Court Reporter

1    A.  Yes.
2    Q.  And your son wasn't residing with you in
3 Clayton; is that correct?
4    A.  Not on a permanent basis, no.
5    Q.  He would essentially leave his guns in
6 your custody, and whenever he could come to your
7 residence, whether it be at his birthday or during
8 the summertime, he would then use the guns while he
9 was there, right?
10    A.  Yes.
11    Q.  So you had possession of his guns in your
12 residence despite the fact they were his?
13    A.  We both did.
14    Q.  The guns that were in the laundry room, do
15 you recall the photograph of the firearms that were
16 in the laundry broom?
17    A.  Yes.
18    Q.  Whose firearms were they?
19    A.  One was Mary Mullins', one was my son's,
20 and one was her son's.
21    Q.  So if she testified that all of her guns
22 were in the gun cabinet, she would have been
23 mistaken?

                    SHEILA A. DOUGHERTY
                    Official Court Reporter

155
Henry W. Glanding, Jr. - Cross

1    A.  One of the 870's she testified was hers.
2 The 870's was in on the gun cabinet.
3    Q.  In the gun cabinet. She could have been
4 mistaken.
5    A.  Apparently.
6    Q.  The ammunition that does not conform to
7 Ms. Mullins' guns was either yours or your son's
8 both?
9    A.  Yes.
10        MR. O'CONNOR: I don't have any other
11 questions.
12        THE COURT: Mr. Schmid.
13        MR. SCHMID: No further questions, Your
14 Honor.
15        THE COURT: The witness may step down.
16        (The witness stepped down.)
17        THE COURT: Mr. Schmid?
18        MR. SCHMID: The defense rests, Your
19 Honor.
20        THE COURT: Mr. O'Connor?
21        MR. O'CONNOR: Nothing further from the
22 State, Your Honor. I think we have a motion we need
23 to make that was discussed at sidebar.

                    SHEILA A. DOUGHERTY
                    Official Court Reporter



1        THE COURT: All right. Members of the
2 jury, I am going to excuse you until tomorrow
3 morning at 10:00 a.m. by which time you should
4 return to the jury room.
5        I remind you: Do not discuss the case
6 among yourselves nor with anyone else. Do not visit
7 or view any premises or place involved, and do not
8 read, view, nor listen to any accounts in the media
9 about the case should there be any. I will inquire
10 of you as I did this morning regarding compliance
11 with the instructions concerning your conduct.
12        Please return to the jury room tomorrow
13 morning by 10:00 a.m. The bailiff will show you
14 out.
15        (The jury left the courtroom.)
16        THE COURT: Mr. O'Connor?
17        MR. O'CONNOR: Your Honor, I apologize to
18 the Court. As a result of the stipulation signed by
19 the defendant, the State would move to amend the
20 indictment. The indictment identifies specifically
21 the defendant's September 23, 1980 guilty plea to
22 possession with intent to deliver methamphetamine.
23 The State would ask that the Court amend that just

                    SHEILA A. DOUGHERTY
                    Official Court Reporter

*MISS (Reading the Jury, Should be asked to dismiss/reading the Fraud Indictment to dismiss)*

1 | to reflect that the defendant did possess a firearm
2 | after having been convicted of a felony, which I
3 | think was the agreed on -- was the intent of the
4 | stipulation between the State and the defense.
5 | THE COURT: Mr. Schmid?
6 | MR. SCHMID: That's correct, Your Honor,
7 | and for the record we do waive any objection at a
8 | later time with respect to that element of the
9 | offense requiring specificity as to the language.
10 | THE COURT: All right. That amendment is
11 | so ordered as to each count.
12 | MR. O'CONNOR: Thank you.
13 | THE COURT: Counsel, I will meet with you
14 | in chambers upon the recess to address jury
15 | instructions. The trial is adjourned until tomorrow
16 | at 10:00 a.m.
17 | (Whereupon the proceedings were
18 | adjourned.)
19 | * * * * *
20 | In Chambers
| The same day.
21 | PRESENT: As noted.
22 | * * * * *
23 | THE COURT: Before I address jury

SHEILA A. DOUGHERTY
Official Court Reporter

1 | instructions, are there any motions, other motions?
2 | MR. O'CONNOR: None from the State, Your
3 | Honor.
4 | THE COURT: Mr. Schmid?
5 | MR. SCHMID: To be quite frank with you,
6 | Your Honor, I have --
7 | THE COURT: Just answer yes or no for now
8 | because I want to --
9 | MR. SCHMID: Yes, Your Honor. I will make
10 | a -- requesting a motion for judgment of acquittal
11 | on the basis of the five weapons identified by Mary
12 | Mullins as belonging to her.
13 | THE COURT: All right. I will let you
14 | address that in a moment.
15 | Mr. O'Connor, I would also like you to
16 | address the issue of the possession of firearm
17 | ammunition by a person prohibited, and the
18 | definition of ammunition under 1448(c) -- (a) --
19 | yes, that's correct, 1448(c), which provides: As
20 | used herein, the word "ammunition" shall mean one or
21 | more rounds of fixed ammunition designed for use in
22 | and capable of being fired from a pistol, revolver,
23 | shotgun or rifle but shall not mean inert rounds or

SHEILA A. DOUGHERTY
Official Court Reporter

159

1 | expended shells, hulls or casings.
2 | For the State, what evidence establishes
3 | that definition of that being capable of being fired
4 | in this case?
5 | MR. O'CONNOR: Your Honor, my response
6 | would be that the State did proffer testimonial
7 | evidence that ammunition was seized from the
8 | defendant's residence by police officers who have
9 | basic knowledge of ammunition. In addition, that
10 | the State did provide evidence by way of photographs
11 | demonstrating specifically not just boxes of
12 | ammunition, but also actual cartridges, and while I
13 | would concede there is no testimony that any
14 | specific piece of ammunition referenced in the case
15 | was offered, which stated that it expressly could
16 | be, that each piece of ammunition or any piece of
17 | ammunition could be fired from a pistol, revolver,
18 | shotgun or rifle, there was testimony that there was
19 | ammunition found for each type of weapon.
20 | The weapons were identified as revolver,
21 | shotguns, rifles, and then there is photographic
22 | evidence of the ammunition itself, and I think that
23 | it is reasonable to infer that a jury could

SHEILA A. DOUGHERTY
Official Court Reporter

160

1 | reasonably infer that the evidence as presented is
2 | sufficient to conclude the State has established
3 | that it is ammunition.
4 | THE COURT: All right. Your response to
5 | Mr. Schmid's earlier motion?
6 | MR. O'CONNOR: I think in respect to that,
7 | I think Mr. Schmid's motion addresses the question
8 | of ownership by Ms. Mullins of the guns. The
9 | question for the jury is the possession of the
10 | weapons. I think it could reasonably be inferred
11 | that the defendant's joint access to the gun cabinet
12 | and her weapons, if they conclude that they were in
13 | fact hers, is sufficient to establish possession.
14 | In addition, she did testify that she was
15 | not staying there, at least that evening, and on
16 | numerous occasions in the past, I believe she said
17 | from January to May of that year, she had stayed at
18 | another residence because of problems with the
19 | defendant, that he constructively possessed her
20 | firearms for her used in the light most favorable to
21 | the State.
22 | I will acknowledge that her testimony
23 | certainly doesn't strengthen the State's case with

SHEILA A. DOUGHERTY
Official Court Reporter

1 respect to those firearms that she identified, but I
2 think there is still a factual basis for the jury to
3 conclude that he possessed them as opposed to owned
4 them, which is what her basic claim was.
5     MR. SCHMID: And yet, Your Honor, there is
6 no evidence as to what time she left, and
7 interestingly enough, the only evidence for the
8 evening of May 11 does not put him in the house at a
9 time when she was not there. So with respect to
10 that evening, no, it is not I believe shown that he
11 had constructive possession at the time that she was
12 not there.
13     And with respect to the other evenings in
14 question, there is no evidence that those weapons
15 were still in the house and that she did not take
16 them with her. And so I think that devolves again
17 to the issue of her claim of ownership and therefore
18 dominion over those rifles.
19     MR. O'CONNOR: Except that the State
20 police did observe the defendant going in and out of
21 his residence. They maintained surveillance on his
22 residence. He was the one in the residence because
23 when they executed the warrant there was nobody else

SHEILA A. DOUGHERTY
Official Court Reporter

---

1 home, and under that circumstance -- well, not
2 conceding that he had to be home to constructively
3 possess them, he was there by himself that day and
4 the State would assert that that is sufficient for a
5 question for the jury at least.
6     THE COURT: All right. Mr. Schmid, your
7 response to the issue regarding the ammunition?
8     MR. SCHMID: With respect to the
9 ammunition, Your Honor, I am reviewing 1448 now.
10 And as I review sub (c), there does not appear to be
11 a specific evidence to indicate that the ammunition
12 does not come under inert rounds or expended rounds,
13 hulls, or casings. At no point during the testimony
14 of State's witnesses did it in fact indicate unfired
15 ammunition. And photographs are in evidence.
16     THE COURT: Any other comment,
17 Mr. O'Connor?
18     MR. O'CONNOR: Just that the photographs
19 do depict unfired ammunition specifically.
20     THE COURT: Depict what?
21     MR. O'CONNOR: Unfired ammunition, unspent
22 ammunition, not casings or inert rounds.
23     MR. SCHMID: Actually, Your Honor, from my

SHEILA A. DOUGHERTY
Official Court Reporter

---

163

1 observation opening several of the boxes, there were
2 numerous fired cartridges in the boxes.
3     MR. O'CONNOR: There were some in there,
4 Your Honor, but one of the photographs entered into
5 evidence specifically shows unspent ammunition.
6     MR. SCHMID: There isn't anything
7 indicated in the photograph that says it is unspent,
8 and there isn't anything in any of the testimony by
9 any of the witnesses that says unspent.
10     THE COURT: All right. There is evidence
11 of bullets in hulls or casings. The issue is
12 whether or not the statutory definition of
13 ammunition, which requires those items be live and
14 capable of being fired, whether that has been
15 established by the evidence.
16     I am convinced after review of the
17 evidence that there is no testimony or evidence from
18 which an inference can be made, that those items
19 were live ammunition, which unlike the firearm,
20 which may be operable or inoperable. It is
21 expressly an element of the offense of possession of
22 firearm ammunition that it be capable of being
23 fired, and it shall not mean inert rounds or which

SHEILA A. DOUGHERTY
Official Court Reporter

---

164

1 the State has not disproved here.
2     Judgment of acquittal is entered as to
3 that single count, which I believe is 0176, from
4 that.
5     With regard to the remaining counts to
6 which the defense has moved, there was evidence of
7 the defendant's residence being observed by the
8 State Police, then entered without any other persons
9 entering or leaving the premises, and then all of
10 the firearms which have been introduced into
11 evidence and found therein. Possession may be sole
12 or jointly, it may be actual or constructive.
13     The State has established sufficient
14 evidence for that issue to go to the jury, and the
15 motion for judgment of acquittal on those counts is
16 denied.
17     Let's turn to jury instructions then. Are
18 there any special requests for jury instructions by
19 the defense?
20     MR. SCHMID: Your Honor, I believe it may
21 be necessary to have the instruction concerning the
22 stipulation and the nature of the stipulation for
23 the jury.

SHEILA A. DOUGHERTY
Official Court Reporter

IT 'IS RELEVANT

1    THE COURT: Anything else?
2        MR. SCHMID: No, Your Honor.
3        THE COURT: Any special requests by the
4  State?
5        MR. O'CONNOR: Two things, Your Honor.
6        One is I would request an instruction with
7  respect to the firearm charges, that it is no
8  defense that a person doesn't know they are
9  prohibited from owning a weapon if a convicted
10 felon, or the other thing, which is something that I
11 spoke to Mr. Schmid about, is on each firearm there
12 was a label, a State police label, that stated that
13 the nature of the case was trafficking in
14 methamphetamine.
15        I had the State Police detective redact
16 that one line off of the label so it can't be read,
17 and I am not certain it warrants a redaction
18 instruction. It has never been brought to the
19 jury's attention. When I reviewed the evidence, I
20 don't believe you can read what is underneath it,
21 but I thought I would bring it to the Court's
22 attention.
23        Mr. Schmid is aware of it. I don't know

POSSESSED ONE

I ONLY gun!

SHEILA A. DOUGHERTY
Official Court Reporter

1  if he is going to request an instruction in that
2  regard or not. Otherwise there are no other
3  redactions that I can think of with respect to this
4  case.
5        MR. SCHMID: Your Honor, there were no
6  overt mentions made to -- rather concerning anything
7  that was going to be omitted from an exhibit, and I
8  concluded that it would be better left alone. It is
9  not really that evident.
10        Essentially what happens is there is a
11 black line marked threw that particular line of each
12 of the evidence tags where it says "nature of case,"
13 and it is just blacked out. It was well done, and
14 isn't highly noticeable, and I had concluded not to
15 ask for an instruction rather than call that or have
16 the jury speculate, gee, what was redacted, and have
17 them start looking.
18        THE COURT: All right. I will give an
19 instruction on the effect of the stipulation, and I
20 will note for the record that Kipp versus State,
21 Delaware Supreme Court case decided in 1998,
22 704 A.2d 839, expressly provides that:  To be guilty
23 of a violation of this section, a person need only

SHEILA A. DOUGHERTY
Official Court Reporter

167

1  know that he or she possessed a weapon.  This
2  section does not require a person to know that it
3  was criminal to do so.
4        And therefore, contemplating consistent
5  with that interpretation of the statute, which is
6  also consistent with my earlier ruling including
7  language in the charge that knowledge on the part of
8  the defendant that he is prohibited, he is a
9  prohibited person, is not required as part of the
10 description of that element.
11        Is that what you are asking for?
12        MR. O'CONNOR: Yes, Your Honor.
13        THE COURT: Any objection to that?  Do you.
14 object to form?
15        MR. SCHMID: No, Your Honor.
16        THE COURT: All right. I will have a copy
17 of the charge for you tomorrow prior to closings.
18        MR. O'CONNOR: Judge, on an unrelated
19 matter, ten o'clock was the time?
20        THE COURT: Yes.
21        Counsel, in the jury charge I am going to
22 read the indictment as amended with regard to the
23 counts remaining. For ease of reference, I am

THIS WAS Amended
RIGHT AFTER my Trial. STATE
New Reads GRABBING V. STATE

168

1  renumbering them one through fifteen. Any objection
2  to that?
3        MR. O'CONNOR: No, Your Honor.
4        MR. SCHMID: No objection.
5              * * * * *
6        (Whereupon the proceedings in Chambers
7  were concluded.)
8              * * * * *

SHEILA A. DOUGHERTY
Official Court Reporter

61

SHEILA A. DOUGHERTY
Official Court Reporter